Taylor, J.
At issue in these two cases coming to us from Macomb and Wayne counties is whether these plaintiffs have standing to pursue actions to compel their respective county board of commissioners to levy a tax to establish a veterans’ relief fund in accordance with the soldiers’ relief fund act, MCL 35.21 el seq. It is uncontested that none of the plaintiffs actually had sought relief under the act. Because of this, the counties asserted that these litigants had suffered no injury and, accordingly, that plaintiffs (1) were without standing to sue and (2) had failed to exhaust statutory remedies. In Lee, the Macomb County case, the trial court granted summary disposition for the county on those grounds. In Walker, the Wayne County case, the trial court denied the county’s motion for summary disposition, concluding that plaintiffs had standing and were not required to exhaust statutory remedies because they alleged a complete failure to comply with the act. The Court of Appeals consolidated the appeals and largely reversed in Lee and affirmed in Walker. 235 Mich App 323; 597 NW2d 545 (1999). It concluded that plaintiffs had standing to sue to compel implementation of the act and that mandamus was a proper remedy. We reverse.
STATUTORY ANALYSIS
In these actions, plaintiffs seek to compel the legislative branch of the county government, the board of commissioners, to levy a tax to establish a veterans’ *730 relief fund pursuant to the soldiers’ relief fund act. MCL 35.21 provides in pertinent part:[1]
The county board of commissioners of each county shall annually levy, a tax not exceeding 1/10 of a mill on each dollar, to be levied and collected as provided by law, upon the taxable property of each township and city, for their respective counties, for the purpose of creating a fund for the relief of honorably discharged indigent members of the army, navy, air force, marine corps, coast guard, and women’s auxiliaries of all wars or military expeditions in which the United States of America has been, is, or may hereafter be, a participant . . . and the indigent spouses, minor children, and parents of each such indigent or deceased member. ... If any money in the fund is not necessary for the purpose for which it was raised, the money shall remain in the treasury of the county as a soldiers’ relief fund, and shall be considered in raising future sums therefor.
As can be seen, this section requires that the board of commissioners create a soldiers’ relief fund by a tax levy. It also, however, requires the commissioners to consider the amount existing in the fund when determining the amount, if any, of the annual levy for the fund.[2]
Having thus established the funding mechanism, the act then continues by providing a procedure in *731 MCL 35.23 for initiating and determining the amount of relief to be granted. This section states:
The supervisor of each township and ward in each of the counties of this state, and where there is no ward supervisor the aldermen of the several wards of every incorporated city in this state, shall, on or before the last Monday in September in each year, make and place in the hands of the soldiers’ relief commission of the county, a list of all the persons entitled to relief under the provisions of this act, and the soldiers’ relief commission, on the first Monday in October in each year, shall proceed to determine the amount necessary for aid and relief to be granted such persons under this act, which shall be then and there recorded in the books to be kept by the secretary of said soldiers’ relief commission. The commission may determine not only the sum to be paid, but the manner of paying the same, and may discontinue the payment of such relief in their discretion. Appeal may be taken therefrom to the circuit court of such county, by certiorari by filing application therefor with the clerk within fifteen days following the making of such decision. The court shall hear the case de novo and its decision shall be final.
What is established, then, is a scheme whereby it is anticipated that the township supervisor or ward aldermen will annually prepare a list of persons eligible for relief and provide this list to the soldiers’ relief commission.[3] That commission then, in its dis *732 cretion, determines the amount of relief, if any, to grant to the indigent, honorably discharged veteran or dependent applicant. Moreover, the statute provides that aggrieved applicants can appeal the commission’s decision to the circuit court.
FACTS AND PROCEEDINGS
Here, without ever having sought relief under the act, plaintiffs filed suit to compel Macomb and Wayne counties to levy the annual tax in order to create the fund of which the act speaks. Further, they, and presumably others, will soon seek damages for those years in which the counties allegedly failed to comply with the act.
Macomb County, in the Lee case, moved for summary disposition, claiming, inter alia, lack of standing and failure to exhaust administrative remedies. In support, it provided the 1994 affidavit of its Department of Veterans Affairs Director, which indicated that the department had, through county budget appropriations, maintained a fund of $1,000 for veterans relief for several years and that no claims for such relief had been filed for the past ten years. The trial court granted Macomb County’s motion for summary disposition, concluding that plaintiffs lacked standing and failed to exhaust administrative remedies because they had not requested relief from the local government.
*733 Wayne County, in the Walker case, sought summary disposition on similar grounds. It provided documentary evidence indicating that, in 1994, the Wayne County Commission approved an appropriation of $1,146,042 for Veterans’ Affairs expenditures and that the Wayne County Soldiers Relief Program had been operational since February 1995. In this case, however, the trial court denied Wayne County’s motion for summary disposition, concluding that plaintiffs had standing because they weré in the class intended to be benefitted by the act and had been harmed by noncompliance with it and that they were not required to exhaust administrative remedies to challenge a wholesale failure to comply with the act.
These two cases were consolidated in the Court of Appeals, which largely reversed in Lee and affirmed in Walker.[4] The Court of Appeals majority concluded that plaintiffs had standing because they are “members of the class for whose benefit the Act was enacted” and because they are “detrimentally affected in a manner different from the public generally.” 235 Mich App 332. The panel held that mandamus was an appropriate remedy here because plaintiffs were seeking compliance with the act, not the levy of a particular amount or the grant of particular benefits. Id. at 333-334. Finally, it concluded that plaintiffs’ actions could not be dismissed on the basis of failure to exhaust statutory remedies because they were alleging a wholesale failure to implement and comply with the act. Id. at 335.
*734 In dissent, former Justice John Fitzgerald, sitting by assignment, disagreed with the majority regarding standing:
[Plaintiffs have not alleged any specific injury as a result of defendants’ failure to establish a mechanism for evaluation of a claim for benefits or of defendants’ underfunding of their respective veterans’ relief funds. [Id. at 337.]
Explaining further he said:
[P]laintiffs have not alleged a distinct and palpable injury resulting from defendants’ failure to fully comply with the statute, and consequently their claims cannot be differentiated from those of any other citizen. As a prudential matter, courts must exercise their jurisdiction to address tangible, personal, threatened interests, not generalized grievances. I am not persuaded that plaintiffs, as private citizens whose individual rights under the statute have not been abridged, have standing .... [Id. (citations omitted).]
Regarding mandamus, he stated that it was inappropriate, assuming standing existed, because plaintiffs were “seeking to compel defendants’ exercise of discretion in a particular manner” that is beyond the scope of mandamus. Id. at 338-339.
This Court granted leave to appeal. 462 Mich 912 (2000).
STANDARD OF REVIEW
Whether a party has standing is a question of law. This Court reviews questions of law de novo. Stitt v Holland Abundant Life Fellowship, 462 Mich 591, 595; 614 NW2d 88 (2000).
*735 STANDING
It is important, initially, to recognize that in Michigan, as in the federal system, standing is of great consequence so that neglect of it would imperil the constitutional architecture whereby governmental powers are divided between the three branches of government.
Standing, as a requirement to enter the courts, is a venerable doctrine in the federal system that derives from US Const, art III, § 1, which confers only “judicial power” on the courts and from US Const, art III, § 2’s limitation of the judicial power to “Cases” and “Controversies.”[5] In several recent cases, the United States Supreme Court has discussed the close relationship between standing and separation of powers. In Lewis v Casey, 518 US 343, 349; 116 S Ct 2174; 135 L Ed 2d 606 (1996), Justice Scalia, writing for the majority, said:
[T]he doctrine of standing [is] a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the *736 role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. [Citations omitted.]
Lewis was foreshadowed in Lujan v Defenders of Wildlife, 504 US 555, 559-560; 112 S Ct 2130; 119 L Ed 2d 351 (1992), where Justice Scalia, again speaking for the Court, explained:
[T]he Constitution’s central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. . . . One of those landmarks, setting apart the “Cases” and “Controversies” that are of the justiciable sort referred to in Article III — “serv[ing] to identify those disputes which are appropriately resolved through the judicial process,” — is the doctrine of standing. Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article HI. [Citations omitted.]
In Plaut v Spendthrift Farm, Inc, 514 US 211, 219-225; 115 S Ct 1447; 131 L Ed 2d 328 (1995), Justice Scalia, in another majority opinion, provided a detailed analysis of the concern with preserving the separation of powers between the legislative and judicial branches, that traced its history back to the framers of the U.S. Constitution.
Finally, Chief Justice Rehnquist even more dramatically stated the case in his majority opinion in Raines v Byrd, 521 US 811, 818, 820; 117 S Ct 2312; 138 L Ed 2d 849 (1997):
“No principle is more fundamental to the judiciary’s proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.”
*737 * * *
“[T]he law of Art HI standing is built on a single basic idea — the idea of separation of powers.”
In Michigan, standing has developed on a track parallel to the federal doctrine, albeit by way of an additional constitutional underpinning. In addition to Const 1963, art 6, § 1 which vests the state “judicial power” in the courts, Const 1963, art 3, § 2 expressly directs that the powers of the legislature, the executive, and the judiciary be separate.[6] Concern with maintaining the separation of powers, as in the federal courts, has caused this Court over the years to be vigilant in preventing the judiciary from usurping the powers of the political branches. Early on, the great constitutional scholar Justice Thomas M. Cooley discussed the concept of separation of powers in the context of declining to issue a mandamus against the Governor in Sutherland v Governor, 29 Mich 320, 324 (1874):
Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others. The executive is for *738 bidden to exercise judicial power by the same implication which forbids the courts to take upon themselves his duties.
This position followed from the even earlier iteration of the standing doctrine by Justice Campbell in 1859 when, speaking for this Court, he said:
By the judicial power of courts is generally understood the power to hear and determine controversies between adverse parties, and questions in litigation. [Daniels v People, 6 Mich 381, 388 (1859)(emphasis added).]
Later, in Risser v Hoyt, 53 Mich 185, 193; 18 NW 611 (1884), this Court explained:
The judicial power referred to is the authority to hear and decide controversies, and to make binding orders and judgments respecting them. [Emphasis added.]
More recently, Johnson v Kramer Bros Freight Lines, Inc, 357 Mich 254, 258; 98 NW2d 586 (1959), reaffirmed this concept by quoting this portion of Risser.
In fleshing out the tests that a litigant must meet to establish standing, the most recent majority iteration from this Court[7] is found in House Speaker v Governor, 441 Mich 547, 554; 495 NW2d 539 (1993):
Standing is a legal term used to denote the existence of a party’s interest in the outcome of litigation that will ensure sincere and vigorous advocacy. However, evidence that a party will engage in full and vigorous advocacy, by itself, is insufficient to establish standing. Standing requires a demonstration that the plaintiff’s substantial interest will be det *739 rimentally affected in a manner different from the citizenry at large.
House Speaker provided a general description of standing and articulated the requirement of an interest distinct from that of the public. However, further explication of the essential elements of standing has proven difficult as demonstrated by this Court’s experience in attempting to fashion a clear majority in Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629; 537 NW2d 436 (1995). In that case, the separate opinions suggested different inquiries as being central to determining standing. Some focused on whether the plaintiff could establish an injury distinct from that of the public, others on whether the plaintiffs were in the zone of interest the statutory or constitutional provision at issue is designed to regulate. Perhaps the clearest template was set forward by Justice Cavanagh who, along with Justice Boyle, advocated adopting the United States Supreme Court’s Lujan test. Lujan held:
Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an “injury in fact” — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) “actual or imminent, not ‘conjectural’ or ‘hypothetical.’ ” Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be “fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.” Third, it must be “likely,” as opposed to merely “speculative,” that the injury will be “redressed by a favorable decision.”
*740 The party invoking . . . jurisdiction bears the burden of establishing these elements. [504 US 560-561 (citations omitted).]
In our view, the Lujan test has the virtues of articulating clear criteria and of establishing the burden of demonstrating these elements. Moreover, its three elements appear to us to be fundamental to standing; the United States Supreme Court described them as establishing the “irreducible constitutional minimum” of standing. We agree. Accordingly, we now join Justice Cavanagh’s view and adopt the Lujan test, which should be seen as supplementing the holding in House Speaker, as well as this Court’s earlier standing jurisprudence, e.g., Daniels and Risser, supra.
Applying this test in the present case, it is clear that plaintiffs lack standing. In Lujan terms, they have not yet suffered any “injury in fact.” See 504 US 560. Specifically, they have shown no “invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not ‘conjectural’ or ‘hypothetical.’ ” Id. at 560. Both groups of plaintiffs have alleged and argued only that they “should receive” and “should have received, the benefit of the property tax levy required by MCL 35.21,” and that the failure to levy and collect the tax set forth in the soldiers’ relief fund act “has caused, and continues to cause, plaintiffs great harm and damage.” Even if accepted as true, these allegations cannot satisfy the Lujan injury in fact requirement because it is not readily apparent how the collection of a tax pursuant to the act would have benefitted plaintiffs in a concrete and particularized manner. MCL 35.23 provides that the soldiers’ relief commission is to determine the amount and manner of any *741 relief thereunder and that it may discontinue such relief in its discretion. Thus, the amount of relief, if any, that plaintiffs might have received under this act is solely within the discretion of the commission.[8] “[G]reat harm and damage” is not concrete or particularized. Plaintiffs also fail to explain, with particularity, what is meant by “the benefit of the property tax levy required by MCL 35.21.” At most, we can only speculate how the existence of a fund would have helped plaintiffs. Accordingly, plaintiffs lack standing to pursue the present actions.
In the absence of standing, we will not address plaintiffs’ substantive claims.
CONCLUSION
Plaintiffs do not have standing to bring the present actions. We accordingly reverse the Court of Appeals determination that they have standing and remand these actions to the respective circuit courts for entry of orders dismissing plaintiffs’ actions on the basis of lack of standing.
*742 Corrigan, C.J., and Young, and Markman, JJ., concurred with Taylor, J.

 This act was initially enacted in 1899 and amended in 1984 to update antiquated language.

 In response to the dissent, we note that, once the fund is created, the act provides the commissioners with discretion regarding the amount of the annual tax levy in light of any amount existing in the fund. Moreover, at oral argument, plaintiffs’ counsel conceded that the record did not establish whether Macomb County had, at some time in the past, created a fund by levying a tax in compliance with the act. Presumably, the record is similarly unclear regarding whether Wayne County, at some time in the past, created a fund by levying a tax in compliance with the act.

 The statute requires the supervisor or alderman to create such a list, but it does not specify the means for identifying eligible persons. Clearly, the supervisor or alderman can only place persons on this list if aware or made aware that an eligible person is in need. The supervisor or alderman can obviously act sua sponte and include on the list any known eligible persons. However in order to fulfill the duty to “make . . . a list of all the persons entitled to relief under the provisions of this act,” he is also obligated to add to the list any eligible person who asks to be included on it. (Emphasis added.) This reading of the statute, rather than one reposing veto power with the supervisor or alderman regarding who will be included on the list, expands the opportunities for eligible veterans who, *732 for whatever reason, have not been included on the list. We opt for this expansive reading because this is a remedial statute and we are obligated to read it liberally in favor of the indigent veterans it is intended to benefit. See Chandler v Dowell Schlumberger Inc, 456 Mich 395, 398; 572 NW2d 210 (1998).

 The Court of Appeals ruled that government immunity precluded plaintiffs’ negligence and gross negligence claims in both cases.

 The first clause of US Const, art El, § 2 states:
The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; — to all Cases affecting Ambassadors, other public Ministers and Consuls; — to ail Cases of admiralty and maritime Jurisdiction; — to Controversies to which the United States shall be a Party; — to Controversies between two or more States; — between a State and Citizens of another State; — between Citizens of different States; — between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

 The powers of government are divided into three branches: legislative, executive and judicial. No person exercising the powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

 This Court addressed standing in Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629; 537 NW2d 436 (1995), but a majority did not agree on a standing test.

 The dissent argues that it is “inescapable” that relief under that act would have benefited the indigent plaintiffs in a concrete and particularized manner. Post at 751. We surmise that the idea is that any claimant would be better off with more money. Yet this verity misses the point. The issue is whether plaintiffs can demonstrate a concrete and particularized injury arising out of the alleged failure of the counties to levy a tax in accordance with the act. Moreover, even if we jump ahead, as the dissent would, to the point where fund distribution to plaintiffs was at issue, it is not “inescapable” that plaintiffs would receive funds because the commission would likely exercise its discretion to avoid duplicating other government and private social welfare programs. Thus, the commission could, even if plaintiffs were indigent, decide not to award funds to them.
Thus, for all these reasons, what might be received, if anything, far from being concrete and particularized, is simply uncertain.