**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED APRIL 14, 2004**

*In re*: KH, KL, KL, AND KJ,

    MINORS.

_____

FAMILY INDEPENDENCE AGENCY,

    Petitioner-Appellee,

v                                     No. 122666

TINA JEFFERSON, RICHARD JEFFERSON,
FREDERICK HERRON, AND LARRY LAGRONE,

    Respondents-Appellants.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

We granted leave to appeal in this case to determine whether our court rules, MCR 5.900 *et seq.*,[1] allow a biological father to request a paternity determination

_____

[1] Effective May 1, 2003, MCR 5.900 *et seq.* were amended and relocated to MCR 3.900 *et seq.* While the former court rules were in effect during the pendency of this case, the subsequent amendments do not alter the analysis or outcome of this case.

during a child protective proceeding in which the subject children have a legal father. We hold that our court rules do not permit a biological father to participate in a child protective proceeding where a legal father exists. Indeed, where a legal father exists, a biological father cannot properly be considered even a putative father.

Under Michigan law, a presumption of legitimacy attaches to a child born or conceived during an intact marriage. Unless and until the presumption of legitimacy is rebutted in a prior proceeding, an alleged biological father cannot seek a determination that he is the natural father of the child pursuant to MCR 5.921(D), and cannot establish a legal paternal relationship in accordance with MCR 5.903(A)(4). The Family Independence Agency erred by naming multiple men in the termination petition where a legal father existed.

In this case, the alleged biological father was not a proper party to the proceedings and could not request a determination that he was the biological father of the children because the children already had a legal father at the time of the proceedings. However, the record contains evidence that could support a finding that both the mother and the legal father, during the course of the proceedings, rebutted the presumption that the children were the issue of the marriage. The trial court did not make a finding

2

that the presumption of legitimacy was rebutted by the parents. Accordingly, this case is remanded to the trial court for such a determination. If the court finds that the presumption of legitimacy was rebutted by the parents by clear and convincing evidence that the children are not the issue of the marriage, the court may take further action in accordance with MCR 5.921(D).

## I. Facts and Procedural History

On April 25, 2002, the Oakland Circuit Court, Family Division, authorized a petition requesting the termination of the parental rights of Tina and Richard Jefferson. The petition also named Larry Lagrone and Frederick Herron as the "putative" fathers of the children.[2] On motion of the prosecution at a pretrial hearing, the petition was subsequently amended by the Family Independence Agency to request that the court terminate the parental rights of fathers Jefferson, Herron, Lagrone, "and/or father John Doe."

At a bench trial conducted on July 8, 2002, the family division referee took testimony establishing that Tina Jefferson was legally married to Richard Jefferson during each child's conception and birth, as well as during the pendency of the child protective proceedings. The referee

---

[2] Lagrone was named as the putative father of KL, KL, and KJ. Herron was named as the putative father of KH.

3

noted that because Richard Jefferson was the legal father of the children, there was "no reason" for Lagrone or Herron to participate in the proceedings "unless there's a challenge otherwise."

Lagrone's counsel asked the referee to make a finding that Richard Jefferson was not the "natural father" of the children so that Lagrone could establish "a legal relationship." Tina Richardson testified that Herron was the biological father of KH, and that Larry Lagrone was the biological father of KL, KL, and KJ. Through counsel, Richard Jefferson indicated that he was not the biological father of the children named in the petition and did not wish to participate further in the proceedings. According to the Family Independence Agency, DNA (deoxyribonucleic acid) testing established that Lagrone was the biological father of KL, KL, and KJ. On the basis of this evidence, the referee determined that Lagrone was the biological father of the three children.

Lagrone filed a motion in the circuit court seeking a ruling that Jefferson was not the father of the three children within the meaning of MCR 5.903. The children's mother argued that a putative father did not have standing to establish paternity in a neglect proceeding. Relying on *In re Montgomery*,[3] the circuit judge held that Lagrone was

---

[3] 185 Mich App 341; 460 NW2d 610 (1990).

4

the biological father of the children and had standing to seek paternity.  It did not make an express finding that the children were not the issue of the marriage. Lagrone's motion to establish paternity was granted, although the circuit judge indicated that it was "troubled" by the result.

Relying on the circuit court ruling, the referee at the termination hearing indicated that Lagrone was the legal father of three children.  The referee ordered Herron, the alleged biological father of KH, to establish paternity within fourteen days or "lose all rights" to the child.

The lawyer-guardian ad litem sought leave to file an interlocutory appeal in the Court of Appeals, which was denied. After the case was held in abeyance for *In re CAW*,[4] we granted leave to appeal.[5]

## II. Standard of Review

On appeal, the guardian ad litem argues that the trial court erred by granting the biological father's motion to establish paternity because he lacked standing, either in the context of a child protective proceeding or under the Paternity Act, MCL 722.711 *et seq*.  Whether a party has

---

[4] 469 Mich 192; 665 NW2d 475 (2003).

[5] 469 Mich 896 (2003).

5

standing to bring an action involves a question of law that is reviewed de novo.[6]

When called on to construe a court rule, this Court applies the legal principles that govern the construction and application of statutes.[7] Accordingly, we begin with the plain language of the court rule. When that language is unambiguous, we must enforce the meaning expressed, without further judicial construction or interpretation.[8] Similarly, common words must be understood to have their everyday, plain meaning.[9]

### III. Analysis

#### a. The Court Rules

The juvenile code, MCL 712A.1 *et seq.*, delineates the scope and jurisdiction of the court in juvenile proceedings, including child protective proceedings, but does not address paternity issues. MCR 5.901 *et seq.*, now MCR 3.901 *et seq.*, were the court rules that governed juvenile proceedings. The scope of those rules, as articulated in MCR 5.901(A), was to "govern practice and

---

[6] *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 734; 629 NW2d 900 (2001).

[7] *CAM Constr v Lake Edgewood Condo Ass'n*, 465 Mich 549, 553; 640 NW2d 256 (2002).

[8] *Veenstra v Washtenaw Country Club*, 466 Mich 155, 160; 645 NW2d 643 (2002).

[9] See MCL 8.3a; see also *Perez v Keeler Brass Co*, 461 Mich 602, 609; 608 NW2d 45 (2000).

procedure . . . in all cases filed under the Juvenile Code."

MCR 5.921, now MCR 3.921, described the parties who were entitled to notice in various juvenile proceedings. MCR 5.921(D), now MCR 3.921(C), provided a mechanism for identifying and providing notice to a putative father. That rule stated that "[i]f at any time during the pendency of a proceeding, the court determines that the minor has no father as defined in MCR 5.903(A)(4),[10] the court may, in

_____

[10] Father was defined in our court rules at MCR 5.903(A)(4) as:

    (a) a man married to the mother at any time from a minor's conception to the minor's birth unless the minor is determined to be a child born out of wedlock;

    (b) a man who legally adopts the minor;

    (c) a man who was named on a Michigan birth certificate . . . or

    (d) a man whose paternity is established in one of the following ways . . . :

    (i) the man and the mother of the minor acknowledge that he is the minor's father by completing and filing an acknowledgment of paternity. . . .

    (ii) the man and the mother file a joint written request for a correction of the certificate of birth pertaining to the minor that results in issuance of a substituted certificate recording the birth [.]

    (iii) the man acknowledges that he is the minor's father by completing and filing an acknowledgment of paternity, without the mother joining in the acknowledgment if she is

7

its discretion" take action to determine the identity of the minor's natural father.[11]

disqualified from signing the acknowledgement by reason of mental incapacity (or) death. . . .

   (iv) a man who by order of filiation or by judgment of paternity is determined judicially to be the father of the minor.

[11] MCR 5.921(D) provided in pertinent part:

   (1) The court may take initial testimony on the tentative identity and address of the natural father. If the court finds probable cause to believe that an identifiable person is the natural father of the minor, the court shall direct that notice be served on that person . . . .

   (2) After notice to the putative father, . . . the court may conduct a hearing and determine that:

* * *

   (b) a preponderance of the evidence establishes that the putative father is the natural father of the minor and justice requires that he be allowed 14 days to establish his relationship according to MCR 5.903(A)(4)[now MCR 3.903 (A)(7)] . . . .

   (3) The court may find that the natural father waives all rights to further notice, including the right to notice of termination of parental rights, and the right to legal counsel if

   (a) he fails to appear after proper notice, or

   (b) he appears, but fails to establish paternity within the time set by the court.

8

The court rule clearly permitted a putative father to be identified and given notice of court hearings only where the minor had "no father." MCR 5.921(D), now MCR 3.921(C). Therefore, if a father already existed under MCR 5.903(A)(4), a putative father could not be identified as a respondent or otherwise given notice.[12]

It is uncontested that Tina and Richard Jefferson were legally married at the time of each minor's conception and birth. Our court rules contemplated that only one man be identified as a respondent in a termination proceeding.[13] Pursuant to MCR 5.903(A)(4)(a), Richard Jefferson is the children's father.[14] No other man may be identified as a

---

[12] The amended court rules include MCR 3.903(A)(23), defining putative father as "a man who is alleged to be the biological father of a child who has no father as defined in MCR 3.903(A)(7)."

[13] In termination proceedings, "respondent" included "*the* father of the child as defined by MCR 5.903(A)(4) [now MCR 3.903(A)(7)]." MCR 5.974(B)(2). (Emphasis added.) The rule contemplated only one man, not a series of identified and unidentified men. See also amended court rule MCR 3.977(B)(2).

[14] In this case, the Family Independence Agency failed to follow the plain language of the court rule when it named multiple men as respondents in the termination petition where the minor children already had a father. At oral argument, the parties indicated that the Family Independence Agency routinely names multiple men on termination petitions, including "John Doe," even where a legal father exists. We reiterate that there is no basis in the court rules for naming serial men on a termination petition when a legal father exists.

9

putative father unless the minors are determined to be "born out of wedlock."[15]

The term "child born out of wedlock" was defined at MCR 5.903(A)(1) as a child "conceived and born to a woman who is unmarried from the conception to the birth of the child, or a child determined by judicial notice or otherwise to have been conceived or born during a marriage but who is not the issue of that marriage."[16] Respondent Lagrone maintains that the children were judicially determined to be "born out of wedlock" when the referee determined that Lagrone was the biological father of the three children.

_____

[15] It is worth noting that where a child had no father, and a putative father was properly identified, the putative father had to establish a legal relationship with the child in order to be named as a respondent in the termination petition. See MCR 5.974(B)(2), now MCR 3.977(B)(2). If a putative father failed to establish paternity within the time set by the court, he could be deemed to have waived all rights to further notice and any right to counsel. MCR 5.921(D)(3), now MCR 3.921(C)(3).

[16] Under the amended court rules, the definition of "child born out of wedlock" was removed and incorporated into the amended definition of "father." See MCR 3.903(A)(7)(a)("Father" means "[a] man married to the mother at any time from a minor's conception to the minor's birth, unless a court has determined, after notice and a hearing, that the minor was conceived or born during the marriage, but is not the issue of the marriage[.]").

10

## b. The Paternity Act

In this case, respondent Lagrone sought a judicial determination that his biological relationship to three of the children named in the petition was sufficient to rebut the presumption of legitimacy and establish Lagrone's status as the legal father of the children. In essence, Lagrone sought to establish legal paternity in a child protective proceeding rather than through the legislatively provided mechanism designed to govern the establishment of paternity claims—the Paternity Act.

Standing to pursue relief under the Paternity Act, MCL 722.711 *et seq.*, is conferred on the mother or father of a child born out of wedlock, or on the Family Independence Agency in limited circumstances.[17] Under the statute, a "child born out of wedlock" is defined as "a child begotten and born to a woman who was not married from the conception to the date of birth of the child, or a child that the court has *determined* to be a child born or conceived during a marriage but not the issue of that marriage."[18]

In *Girard v Wagenmaker*,[19] this Court held that a biological father had no standing to establish paternity of a child born during an intact marriage "without a prior

---

[17] MCL 722.714(1),(4).

[18] MCL 722.711(a).

[19] 437 Mich 231; 470 NW2d 372 (1991).

11

determination that the mother's husband is not the father."[20] A "prior determination" was required because the Legislature used the present perfect tense of the verb "determine," which was indicative of a past action rather than a contemporaneous action. Additionally, requiring a prior determination comported "with the traditional preference for respecting the presumed legitimacy of a child born during a marriage."[21]

Clearly, if respondent Lagrone had sought to establish paternity under the Paternity Act, his claim would have failed for lack of standing because, at the time he sought to establish paternity, there was no prior adjudication that the children were born out of wedlock.

In *In re CAW*, the majority opinion did not reach the question presented in this case, because "no finding was ever made by the court that [the child] was not the issue of the marriage."[22] However, Justice WEAVER's concurring opinion did address the issue, reconciling the court rules with the Paternity Act. We agree with and adopt this analysis. Specifically, Justice WEAVER noted that the

---

[20] *Id*. at 235. In *Girard*, the plaintiff claimed to be the biological father of a child conceived and born during the marriage of the defendant and her husband. Defendant's husband "continuously accepted and supported the child as his own." *Id*.

[21] *Id*. at 246.

[22] *In re CAW, supra* at 199.

12

definition of "child born out of wedlock" in the court rules varies from that in the Paternity Act "only in its additional provision that a child may be determined to be born out of wedlock 'by judicial notice or otherwise' and in its use of the past tense of the verb 'to determine,' rather than the present perfect tense of that verb."[23] Accordingly, we conclude, consistently with the language of the Paternity Act, that a determination that a child is born out of wedlock must be made by the court before a biological father may be identified in a child protective proceeding.

Under either version of the court rule, MCR 5.921(D) or MCR 3.921(C), a prior out-of-wedlock determination does not confer *any type* of standing on a putative father. Rather, the rules give the trial court the discretion to provide notice to a putative father, and permit him to establish that he is the biological father by a preponderance of the evidence. Once proved, the biological father is provided fourteen days to establish a legally recognized paternal relationship.

Nothing in the prior or amended court rules permits a paternity determination to be made in the midst of a child protective proceeding. Rather, once a putative father is identified in accordance with the court rules, the impetus

[23] 469 Mich 202-203.

is clearly placed on the putative father to secure his legal relationship with the child as provided by law. If the legal relationship is not established, a biological father may not be named as a respondent on a termination petition, the genetic relationship notwithstanding. MCR 5.974(B)(2).

### c. The Presumption of Legitimacy

The presumption that children born or conceived during a marriage are the issue of that marriage is deeply rooted in our statutes and case law.[24] This presumption of legitimacy, most recently reaffirmed in *In re CAW*,[25] has been consistently recognized throughout our jurisprudence,

---

[24] The divorce act, MCL 552.1 *et seq.*, at MCL 552.29 states that "[t]he legitimacy of all children begotten before the commencement of any action under this act shall be *presumed* until the contrary be shown." (Emphasis added.) See also MCL 700.2114(1)(a) ("If a child is born or conceived during a marriage, both spouses are presumed to be the natural parents of the child for the purposes of intestate succession."). See also the vital records act, MCL 333.2824(1) ("The name of the husband at the time of conception or, if none, the husband at birth shall be registered as the father of the child" on the birth certificate.) and MCL 333.2824(6) ("A child conceived by a married woman with the consent of her husband following the utilization of assisted reproductive technology is considered to be the legitimate child of the husband and wife.").

[25] *In re CAW, supra* at 199.

14

and can be overcome only by a showing of clear and convincing evidence.[26] In *Case*, this Court stated:

> The rule that a child born in lawful wedlock will be presumed to be legitimate is as old as the common law. *It is one of the strongest presumptions in the law.* The ancient rule made the presumption conclusive, if the husband was within the four seas. The modern one permits the presumption to be overcome, but only upon proof which is very convincing. [*Id*. at 284 (emphasis added).]

By requiring a previous determination that a child is born out of wedlock, the Legislature has essentially limited the scope of parties who can rebut the presumption of legitimacy to those capable of addressing the issue in a prior proceeding—the mother and the legal father.[27] As this Court noted in *Girard,* paternity claims generally arise during divorce or custody disputes, and the Legislature contemplated "situations where a court in a prior divorce or support proceeding determined that the legal husband of the mother was not the biological father of the child."[28] If the mother or legal father does not rebut the presumption

---

[26] See *Serafin v Serafin*, 401 Mich 629; 258 NW2d 461 (1977); *Wechsler v Mroczkowski*, 351 Mich 483; 88 NW2d 394 (1958), overruled in part on other grounds by *Bunda v Hardwick*, 376 Mich 640; 138 NW2d 305 (1965); *Bassil v Ford Motor Co*, 278 Mich 173; 270 NW 258 (1936); *People v Case*, 171 Mich 282, 284; 137 NW 55 (1912).

[27] As this Court has noted previously, "[t]here is no area of law more requiring finality and stability than family law." *Hackley v Hackley*, 426 Mich 582, 598; 395 NW2d 906 (1986)(opinion by BOYLE, J.).

[28] 437 Mich 246.

of legitimacy, the presumption remains intact, and the child is conclusively considered to be the issue of the marriage despite lacking a biological relationship with the father.[29]

### d. Resolution of this case

In this case, Larry Lagrone should not have been permitted to participate in the termination proceedings or request a determination that he was the biological father of three of the four children because, at the time of the proceedings, Richard Jefferson was the legal father of the children and the presumption of legitimacy remained intact.

---

[29] The trial court relied on *In re Montgomery* in granting respondent Lagrone's motion to establish paternity. However, we believe that *Montgomery* was wrongly decided and overrule it to the extent that it is inconsistent with this opinion.

In *Montgomery*, the legal father was dismissed as a party in parental termination proceedings against his wife. After admitting that he was not the child's biological father, the legal father was dismissed from the proceedings and another man was declared to be the child's biological father. The legal father appealed his dismissal from the proceedings. The Court of Appeals held that once the legal father admitted that he was not the biological father, respondent was "not the minor child's father within the meaning of the court rules" and did not have standing to participate in the termination hearing. 185 Mich App 343.

That the legal father admitted having no *biological* relationship to his child does not indicate that he was interested in relinquishing his parental rights to his child. Because the legal father appealed his dismissal from the proceedings, it is fair to infer that he wanted to be part of the termination proceedings, and may have been interested in planning for the child. Nothing in *Montgomery* indicates that the legal father was given the opportunity to claim the benefit of the presumption of legitimacy.

However, the record contains evidence that could plausibly support the conclusion that, during the course of the proceedings, both the mother and the legal father rebutted the presumption that the children were the issue of the marriage.[30] Tina Jefferson testified that her husband was not the father of the children named in the petition. Richard Jefferson indicated that he was not the children's father; in addition, Jefferson maintained that he did not wish to further participate in the proceedings. The latter statement could reasonably be construed as an indication that Jefferson was prepared to renounce the benefit afforded him by the presumption of legitimacy and to not claim the children as his own.[31]

However, the trial court did not make a finding that the presumption of legitimacy was rebutted by the parents. If such a finding had been made, the children would have no "father" as defined in MCR 5.903(A)(4), and another man, presumably Larry Lagrone, could have been identified as a putative father pursuant to MCR 5.921(D).

---

[30] We read MCR 5.903(A)(1) to have been consistent with the Paternity Act and to have required a prior judicial determination that the subject children were not the issue of the marriage before a claimed biological father could be permitted an opportunity to establish a legal relationship pursuant to MCR 5.921(D)(2)(b). However, there is no basis for using the language of the Paternity Act against the legal parents to restrict a mother or legal father's ability to rebut the presumption of legitimacy.

17

If Mr. Lagrone had been so identified, and elected to establish paternity as permitted by MCR 5.921(D)(2)(b), the out-of-wedlock determination made in the child protective proceeding could serve as the prior determination needed to pursue a claim under the Paternity Act. *Girard, supra*.

Accordingly, this case is remanded to the trial court for such a determination. If the court finds that the presumption of legitimacy was rebutted by clear and convincing evidence from either parent that the children are not the issue of the marriage, the court may take further action in accordance with MCR 5.921(D).

> Robert P. Young, Jr.
> Maura D. Corrigan
> Elizabeth A. Weaver
> Clifford W. Taylor
> Stephen J. Markman

18

In re: K.H., K.L., K.L., and
K.J., Minors.

_____

FAMILY INDEPENDENCE AGENCY,

    Petitioner-Appellee,

v                                                                No. 122666

TINA JEFFERSON, RICHARD JEFFERSON,
FREDERICK HERRON, and LARRY LAGRONE.

    Respondents-Appellants.

_____

CAVANAGH, J. (*dissenting*).

Today, the majority holds yet again that our court rules deprive a putative father of the right to participate in child protective proceedings. This viewpoint is not supported by our court rules and it denies putative fathers, as well as children, their due process rights. Therefore, I respectfully dissent.

As stated in my dissent in *In re CAW*, 469 Mich 192, 209; 665 NW2d 475 (2003), "the Legislature intended to allow putative fathers an opportunity to intervene in child protective proceedings. Hence, the majority errs by applying MCR 5.921(D) in a manner that prohibits standing." The court rules allow for a judicially determined judgment of paternity to be used to determine that a man is a

"father," and the court rules make no mention that this must be done pursuant to the Paternity Act. See MCR 5.903(A) and 5.921(B)(3), now MCR 3.903(A) and 3.921(B), (C).

In this case, the putative father was named a party to the child protective proceedings by the Family Independence Agency. His participation was compelled, which makes the majority's determination that he does not have the right to participate even more outrageous. However, even if he had not been named a party, to summarily deny him the right to be determined to be a "father" denies the putative father his due process rights, but, more importantly, it denies courts the opportunity to determine what is in the best interests of the children. This is never more evident than in a child protective proceeding, where the children's legal parents may have their parental rights terminated, thereby leaving the children with no legal parents and, possibly, no caregivers. Denying putative fathers the right to participate in the proceedings may deprive the children of a chance to have a loving relationship with an interested and caring parent.

The children's legal mother in this case was a cocaine addict and frequently homeless. After years of abuse and neglect, her rights are being terminated. The children's

2

legal father is in prison and wants nothing to do with the children. The children's putative father seeks nothing more than *a chance* to be determined a "father" so that he may have his custody and visitation rights considered by the courts. Denying him this right deprives the courts of valuable information necessary to determine the best interests of the children. "Courts making paternity and custody determinations have the authority to inquire about a child's putative father or parent in fact. Without it, a court would be deprived of the means necessary to ensure that a child's best interests and due-process rights are protected." *CAW*, *supra* at 209 (Cavanagh, J., dissenting).

Further, as detailed in my dissent in *Girard v Wagenmaker*, 437 Mich 231, 253-278; 470 NW2d 372 (1991), nothing in our statutes or court rules requires that a putative father must first establish paternity in a separate legal proceeding. This untenable rule effectively precludes a putative father from establishing a relationship with his child unless approved by the legal mother, regardless of whether the child has a legal father who plays a role in his life and regardless of the reasons the legal mother may choose to exclude the putative father.

Allowing a putative father standing to bring a paternity claim does not mean that the claim will

automatically be decided in his favor.  As I stated in *Girard*, *supra* at 272, allowing a putative father "standing to bring his paternity claim would not *in any way* endorse or prejudge his claim to provide support for the child, or his claim to custody or visitation rights."  The best interests of the child are paramount, and the child's best interests can only be properly assessed if all parties are given the opportunity to have their day in court.  Unlike the majority, "I am unwilling to make the arbitrary assumption that *no* support, custody, or visitation claim by a putative father, regarding the child of a married woman, will *ever* have sufficient merit to justify recognizing the standing of *any* such claimants."  *Id.*

Further, unlike the majority, I do not believe in closing my eyes and pretending that the putative father does not exist.  Some may argue that denying the putative father standing protects the sanctity of marriage.  But as I stated in *Girard*, *supra* at 271, "It is surely a bit late to talk of preserving the 'sanctity' of the marital family by the time a situation like the one alleged in this case has arisen."

I do not believe a putative father should be cast as a villain merely because he seeks to establish a relationship with his child.  Whether the establishment of such a

4

relationship will be in the child's best interests is a matter for the court to decide,[1] but to deny a putative father standing to even make such a request deprives him, and the child, of due process rights. Further, it is noteworthy that the majority's refusal to allow putative fathers standing does not emanate solely from a concern to protect intact families. In cases in which there was not an intact family, the majority has continued to deny putative fathers, and their children, their due process rights. See, e.g, *Pniewski v Morlock*, 469 Mich 898 (2003); *CAW*, *supra* at 199.

An arbitrary, bright-line rule puts the illusion of an intact family over the reality that children's lives are at stake. This case highlights the problem. The legal mother testified that the putative father was the biological father of the children and the legal father also testified that he was not the biological father of the children and did not want to participate in the proceedings. However, if the legal mother and the legal father had not offered testimony rebutting the presumption of legitimacy, the putative father would have had no recourse.

---

[1] See, e.g., *In re Jesusa V*, 32 Cal 4th 588; 10 Cal Rptr 3d 205; 85 P3d 2 (2004).

Finally, a court is statutorily mandated to assess the best interests of the child in *all* disputes involving a minor child's custody. See MCL 722.24. However, the majority finds that the best interests control when there is a custody dispute between two legal parents, but not when a dispute involves a putative parent. Children have due process rights to be protected from arbitrary harm by the government. The child's right to have his best interests decided by a court of law should not be inferior to a legal father's right to custody.

I wholeheartedly agree with the majority that the record contains evidence that supports a finding that, during the proceeding, the legal mother and the legal father rebutted the presumption that the children were the issue of their marriage. However, while I believe that there is more to being a parent than mere biology, I also believe that there is more to being a parent than the rights conveyed by a marriage license. A narrow view of standing grounded in neither statute nor court rule should not defeat a meaningful examination of the best interests of the children. Therefore, I respectfully dissent.

Michael F. Cavanagh
Marilyn Kelly

6