WEAVER, J.
(concurring). I concur in and sign all of the majority opinion except part 11(C), entitled “Stare Decisis.”
I write separately to expand on footnote 8 of the majority opinion by providing some of the additional criticisms of Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001), and its progeny mentioned in that footnote.
As I stated in my dissenting opinion in Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 280, 311; 737 NW2d 447 (2007):
*379 Beginning with Lee v Macomb Co Bd of Comm’rs, the majority overruled Michigan precedent establishing prudential standing as the traditional doctrine of legal standing in Michigan. In place of Michigan’s doctrine of prudential standing, the majority erroneously adopted a constitutional doctrine of standing based on the federal courts’ doctrine of standing, as stated in Lujan v Defenders of Wildlife.[1]
I further stated:
Before Lee, no Michigan case had held that the issue of standing posed a constitutional issue.[2] Nor did any case hold that Michigan’s judicial branch was subject to the same case-or-controversy limitation imposed on the federal judicial branch under article III of the United States Constitution.[3] In fact, article III standing derived from Lujan was not even an issue raised or briefed by the parties in Lee. On its own initiative, the majority of four raised Lujan’s standing test and erroneously transformed standing in Michigan into a constitutional question. [Id. at 312-313.]
*380 After the majority in Lee created a constitutional standing test for Michigan, the same “majority of four” (former Justice TAYLOR and Justices CORRIGAN, YOUNG, and Markman) “next questioned the Legislature’s ability to confer standing on citizens through the use of statutes granting standing when a citizen alleges a specific wrong.” Id. at 314-315. As I further stated in Nestlé-.
In Nat’l Wildlife [Federation v Cleveland Cliffs Iron Co, 471 Mich 608; 684 NW2d 800 (2004)], the majority of four attacked [the Michigan Environmental Protection Act, MCL 324.1701 et seq. (MEPA)] by stating at length, all in dicta, that the Legislature cannot grant citizens standing. The majority based this argument on the premise that the Legislature would be taking away the power to enforce laws, an essential component of the “executive power,” and giving that power to the judicial branch. The majority proudly proclaimed that it was “resisting an expansion of power — not an everyday occurrence in the annals of modern government.”[4] Unfortunately, that statement was not accurate, because the majority showed its lack of judicial restraint by compromising the Legislature’s constitutional duty to enact laws for the protection of the environment and enlarging the Court’s capacity to overrule statutes under the guise of the majority’s self-initiated, erroneous “constitutional” doctrine of standing.[5] [Nestlé, 479 Mich at 315.]
As Justice CAVANAGH’s majority opinion in this case states at footnote 9, I described in Nat’l Wildlife how the Lee standing doctrine violated separation of powers under the Michigan Constitution. In Nat’l Wildlife, I stated:
*381 While pretending to limit its “judicial power,” the majority’s application of Lee’s judicial standing test in this case actually expands the power of the judiciary at the expense of the Legislature by undermining the Legislature’s constitutional authority to enact laws .... [Nat’l Wildlife, 471 Mich at 654 (Weaver, J., concurring).]
In expanding the judicial power by making standing a constitutional concern, the “majority of four” took
the area of legal standing out of the hands of the Legislature and the people and placed it exclusively at [the majority of four’s] mercy. To make standing a constitutional concern when our Michigan Constitution is completely silent regarding which of the government’s branches has power to grant standing represents judicial activism of the most objectionahle sort.” [Rohde v Ann Arbor Pub Sch, 479 Mich 336, 373; 737 NW2d 158 (2007).]
Lee and its progeny clearly defied common sense and fairness, as those cases ignored Michigan’s Constitution and imposed “unprecedented, judge-made restrictions on . . . access to the courts.” Nat’l Wildlife, 471 Mich at 654 (Weaver, J., concurring). The Lee standing doctrine represented an unprecedented and unrestrained expansion of judicial power that dishonored our Michigan Constitution and decimated the rule of law and therefore it must be reversed. Accordingly, for the reasons I have given over the last nine (9) years since Lee was decided and for the reasons in Justice CAVANAGH’s majority opinion in this case, I vote to overrule Lee and its progeny.
With regard to the policy of stare decisis, my view is that past precedent should generally be followed but that to serve the rule of law, in deciding whether wrongly decided precedent should be overruled, each case should be looked at individually on its facts and merits through the lens of judicial restraint, common sense, and fairness. I agree with the sentiment recently expressed by Chief *382 Justice Roberts of the United States Supreme Court in his concurrence to the decision in Citizens United v Fed Election Comm, 558 US _, _; 130 S Ct 876, 920; 175 L Ed 2d 753, 806 (2010), when he said that
stare decisis is neither an “inexorable command,” Lawrence v. Texas, 539 U. S. 558, 577 [123 S Ct 2472; 156 L Ed 2d 508] (2003), nor “a mechanical formula of adherence to the latest decision,” Helvering v. Hallock, 309 U. S. 106, 119 [60 S Ct 444; 84 L Ed 604] (1940).... If it were, segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants. See Plessy v. Ferguson, 163 U. S. 537 [16 S Ct 1138; 41 L Ed 256] (1896), overruled by Brown v. Board of Education, 347 U. S. 483 [74 S Ct 686; 98 L Ed 873] (1954); Adkins v. Children’s Hospital of D. C., 261 U. S. 525 [43 S Ct 394; 67 L Ed 785] (1923), overruled by West Coast Hotel Co. v. Parrish, 300 U. S. 379 [57 S Ct 578; 81 L Ed 703] (1937); Olmstead v. United States, 277 U. S. 438 [48 S Ct 564; 72 L Ed 944] (1928), overruled by Katz v. United States, 389 U. S. 347 [88 S Ct 507; 19 L Ed 2d 576] (1967).
Chief Justice Roberts further called stare decisis a “principle of policy” and said that it “is not an end in itself.” Id. at _; 130 S Ct at 920; 175 L Ed 2d at 807. He explained that “[i]ts greatest purpose is to serve a constitutional ideal — the rule of law. It follows that in the unusual circumstance when fidelity to any particular precedent does more to damage this constitutional ideal than to advance it, we must be more willing to depart from that precedent.” Id. at _; 130 S Ct at 921; 175 L Ed 2d at 807.[6]
*383 I agree with Chief Justice Roberts that stare decisis is a policy and not an immutable doctrine. I chose not to sign Chief Justice KELLY’s lead opinion in Petersen v Magna Corp, 484 Mich 300, 316-320; 773 NW2d 564 (2009), because it proposed to create a standardized test for stare decisis. Likewise, I do not sign the majority opinion’s stare decisis section in this case because it applies Petersen. There is no need for this Court to adopt any standardized test regarding stare decisis. In fact, it is an impossible task. There are many factors to consider when deciding whether or not to overrule precedent, and the importance of such factors often changes on a case-by-case basis.[7]
*384 In the end, the consideration of stare decisis and whether to overrule wrongly decided precedent always includes service to the rule of law through an application and exercise of judicial restraint, common sense, and a sense of fairness — justice for all.
In serving the rule of law and applying judicial restraint, common sense, and a sense of fairness to the case at hand, I agree with and join the majority opinion’s holding that Lee and its progeny are overruled.

1 Lujan v Defenders of Wildlife, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992).

2 Before Lee, the Michigan standing requirements were based on prudential, rather than constitutional, concerns. See, generally, House Speaker v State Admin Bd, 441 Mich 547, 559 n 20; 495 NW2d 539 (1993), and Justice Riley’s concurrence in Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629, 643; 537 NW2d 436 (1995).

3 As I wrote in my concurrence in Lee:
In House Speaker we stated that “this Court is not bound to follow federal cases regarding standing,” pointing out that “[o]ne notable distinction between federal and state standing analysis is the power of this Court to issue advisory opinions. Const 1963, art 3, § 8. Under Article III of the federal constitution, federal courts may issue opinions only where there is an actual case or controversy.” [House Speaker, 441 Mich at] 559, including n 20. Justice Kennedy, writing for the Court in ASARCO Inc v Kadish, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989), acknowledged:
“We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not hound by the limitations of a case or controversy or other federal rules of justiciability . ...” [Lee, 464 Mich at 743 n 2.]

4 Nat’l Wildlife, 471 Mich at 639 (emphasis in original).

5 “[F]aux judicial restraint is judicial obfuscation.” Fed Election Comm v Wisconsin Right to Life, Inc, 551 US 449, 499 n 7; 127 S Ct 2652; 168 L Ed 2d 329 (2007) (Scalia, J., concurring in part and concurring in the judgment).

 It appears that the dissent in this case does not agree with Chief Justice Roberts. The dissent refers to cases that have been overruled by this Court in the past 18 months. While the dissenting justices may feel aggrieved by this Court overruling those cases, amongst those cases were some of the most egregious examples of judicial activism that did great harm to the people of Michigan. Those decisions were made by the *383 “majority of four,” including the dissenting justices, under the guise of ideologies such as “textualism” and “judicial traditionalism.” One of the dissenting justices, Justice Young, expressed his apparent contempt for the common law and common sense in his 2004 article in the Texas Review of Law and Politics, where Justice Young stated:
Consequently, I want to focus my remarks here on the embarrassment that the common law presents — or ought to present — to a conscientious judicial traditionalist. . . .
To give a graphic illustration of my feelings on the subject, I tend to think of the common law as a drunken, toothless ancient relative, sprawled prominently and in a state of nature on a settee in the middle of one’s genteel garden party. Grandpa’s presence is undoubtedly a cause of mortification to the host. But since only the most ill-bred of guests would be coarse enough to comment on Grandpa’s presence and condition, all concerned simply try ignore him. [Young, A judicial traditionalist confronts the common law, 8 Texas Rev L & Pol 299, 301-302 (2004).]

 Over the past decade, the principal tool used by this Court to decide when a precedent should be overruled is the set of guidelines that was laid out in Robinson v Detroit, 462 Mich 439, 463; 613 NW2d 307 (2000), an opinion written by former Justice TAYLOR, signed by Justices Corrigan, Young, and Markman and myself, and that I have used numerous times. By no means do I consider the Robinson guidelines a “be-all, end-all test” that constitutes precedent of this Court to be used whenever this Court considers overruling precedent. I view Robinson as merely providing guidelines to assist this Court in its legal analysis when pertinent.