# STATE OF MICHIGAN

# COURT OF APPEALS

JOSEPH RICHARD DEMSKI,

Plaintiff-Appellee,

v

CASSIDIE ANN PETLICK, f/k/a CASSIDIE
ANN POINTER, and JEFFREY PETLICK,

Defendant-Appellants.

FOR PUBLICATION
March 5, 2015

No. 322193
Berrien Circuit Court
LC No. 12-003323-DP

Before: BOONSTRA, P.J., and DONOFRIO and GLEICHER, JJ.

GLEICHER, J. (*dissenting*).

During the first two-and-a-half years of her life, MP lived solely with her married parents, Cassidie and Jeffrey Petlick. Jeffrey's awareness that he was not MP's biological father did nothing to dim his devotion to his daughter.

Joseph Demski, MP's biological father, sought to establish a role for himself in MP's life. The trial court considered Demski's paternity claim under the Revocation of Paternity Act (RPA), MCL 722.1431 *et seq.*, and convened a two-day evidentiary hearing. The trial court ruled that MP was born out of wedlock and entered an order of filiation in Demski's favor, thereby disestablishing Jeffrey's paternity and extinguishing his parental rights, despite that Jeffrey continues to live with his wife and MP. Six months later, without holding an additional hearing, the trial court awarded Demski joint legal custody of MP and parenting time.

The majority detects no errors in the trial court's rulings or procedure. I respectfully dissent. I believe that Demski was obligated to produce clear and convincing evidence that declaring MP born out of wedlock would serve the child's best interests, and that this showing was not made. Moreover, the trial court's ex parte consideration of expert testimony and its failure to hold a separate evidentiary hearing to consider the child's best interests contravened the Child Custody Act (CCA), MCL 722.21 *et seq.*, mandating reversal of its joint legal custody and parenting-time decisions.

## I. THE PATERNITY PROCEEDINGS

The RPA permits a court to determine that a child born to married parents was "born out of wedlock" when certain circumstances are shown. MCL 722.1441(3)(c). That Cassidie was not married at the time of MP's conception and that Demski filed his revocation of paternity

-1-

action within three years of MP's birth supplied the predicate grounds for Demski's claim. Once established, those facts empowered the trial court to gather evidence of MP's best interests in deciding whether to declare MP a child "born out of wedlock."

A child's best interests are embedded within the Act: "A court may refuse to enter an order setting aside a paternity determination or determining that a child is born out of wedlock if the court finds evidence that the order would not be in the best interests of the child." MCL 722.1443(4). Notably, the Legislature placed the best-interest inquiry ahead of a determination that a child was born out of wedlock. Only after taking into account a child's best interests is a court vested with authority to "[m]ake a determination of paternity and enter an order of filiation as provided under . . . MCL 722.717." MCL 722.1443(2)(d).

DNA testing revealed that Demski fathered MP. MCL 722.1445 specifies that the clear and convincing standard of proof applies regarding the evidence that an alleged father "is the child's father[.]"[1] DNA proof of paternity easily satisfies that standard. However, the RPA endorses that genetics alone do not a father make. "The results of blood or tissue typing or DNA identification profiling are not binding on a court in making a determination under this act." MCL 722.1443(5). Furthermore, the Legislature explicitly authorized a trial court to "*refuse* to enter an order setting aside a paternity determination or determining that a child is born out of wedlock if the court finds evidence that the order would not be in the best interests of the child." MCL 722.1443(4) (emphasis added).[2] The Act makes no mention of the standard of proof

---

[1] "If an action is brought by an alleged father who proves by clear and convincing evidence that he is the child's father, the court may make a determination of paternity and enter an order of filiation as provided for under . . . MCL 722.717." MCL 722.1445.

[2] MCL 722.1443(4) further dictates that "[t]he court may consider the following factors" when determining whether a child is born out of wedlock:

> (a) Whether the presumed father is estopped from denying parentage because of his conduct.
>
> (b) The length of time the presumed father was on notice that he might not be the child's father.
>
> (c) The facts surrounding the presumed father's discovery that he might not be the child's father.
>
> (d) The nature of the relationship between the child and the presumed or alleged father.
>
> (e) The age of the child.
>
> (f) The harm that may result to the child.

applicable to the court's best-interest determination under the RPA.  The majority assumes that the preponderance standard applies.  In my view, the appropriate standard is that of clear and convincing evidence.

This issue comes to us by way of the Petlicks' argument that the trial court failed to assign to Demski "the burden of persuasion."  I agree with the majority that the record generally refutes that proposition.  The Petlicks further contend that based on "the presumption in favor of maintaining the child's established custodial environment," Demski was required to present "clear and convincing evidence" that MP's best interests would be served by revoking Jeffrey's presumed paternity.  The majority observes that "the trial court indicated that it had applied a clear and convincing evidentiary standard when it reached its determination regarding the best interests of the child under MCL 722.1443(4)."  The record is not nearly so straightforward.  And in this case, Demski's evidence concerning MP's best interests fell well short of even an evidentiary preponderance.

Indisputably, the trial court used a clear and convincing standard when ruling that Demski had demonstrated "that he is the child's [biological] father."  The Legislature plainly prescribed that "clear and convincing" evidence must control a court's paternity determination in MCL 722.1445.  The DNA evidence supporting Demski's parentage went unchallenged.  Hence, the trial court's distinct articulation that clear and convincing evidence dictated its paternity finding is unsurprising.  Whether the trial court employed a clear and convincing standard when it evaluated the child's best interests under the RPA represents an entirely different question.

The trial court prefaced its discussion of the statutory factors involving a child's "best interests" as follows:

> The plaintiff has timely filed a complaint to determine parentage, custody, child support, and parenting time.  Accordingly MCL 722.1443(13)4 [sic MCL 722.1443(4)] directs that the Court may refuse to enter an order determining that a child is born out of wedlock if the Court finds evidence that the order would not be in the best interest the child.

The court proceeded to discuss best-interest factors (d), (f), and (g).  After reviewing the evidence related to these factors, the court reiterated that it had found "by clear and convincing evidence" that Demski was MP's "biological father," but made no specific comment as to the standard of proof it had applied when analyzing the statutory factors.  Rather, the court appeared to separate its "clear and convincing" biology finding from its best-interest determinations:

---

(g) Other factors that may affect the equities arising from the disruption of the father-child relationship.

(h) Any other factor that the court determines appropriate to consider.

The parties agreed that factors (a), (b), and (c) were not applicable to this case.

-3-

The Court is fully persuaded, having placed as indicated, the determination of what weight's to be given to the testimony of witnesses, all exhibits, all testimony, and clearly that of the expert witness. In light of the direction and the new direction and law for the State of Michigan, the Court is going to grant the petition of the plaintiff.

With that, an order, Mr. Banyon, consistent with [the] directive of MCL 722.1445 in terms of the termination of paternity; again, by clear and convincing evidence that your client is indeed the biological father and the Court having made specific findings relative to the other factors of the new act, consistent with MCL 722.717 Section 7, an order for paternity would enter. . . .

A fair reading of this ruling leaves open to question whether the trial court determined that clear and convincing evidence, rather than an evidentiary preponderance, supported its best-interest finding under the RPA.

Regardless of which standard of proof applies, I agree with the majority that Demski bore the burden of persuading the court that determining MP to have been born out of wedlock would serve her best interests. During his case-in-chief, Demski presented virtually *no* evidence addressing MP's best interests. His testimony focused on himself and the historical events surrounding MP's conception and birth, and his justifications for having had no contact with the child for most of her life. His girlfriend's testimony centered on the couple's pit bull and the reasons that it would pose no danger to MP. She also assured the court that the couple had discontinued using marijuana. Demski's mother testified that he had never harmed a child, and that she was available to assist Demski "in whatever his needs may be."

Had the trial ended with Demski's proofs, the record would not have supported a best-interest finding in Demski's favor. Demski presented precious little evidence concerning MP's needs or interests. Only a miniscule quantum of testimony related to Demski's plan for dealing with MP's cognitive and emotional responses to the insertion of a new father in her young life. Aside from his cellular contribution to MP's conception, Demski offered no evidence that disestablishing Jeffrey's paternity would advance the child's best interests.

The Petlicks' evidence more directly addressed the RPA's best-interest factors, primarily via the testimony of psychotherapist Robin Zollar. No discussion ensued during the trial, however, regarding the standard of proof applicable to the trial court's evaluation of Zollar's testimony, or that of any other witnesses, regarding MP's best interests. To the extent the majority endorses a preponderance standard, I disagree.

Given that RPA proceedings implicate weighty interests for both parents and children, I believe that the clear and convincing standard must govern the best-interest determination. Where a statute is silent as to the applicable standard of proof, the issue has "traditionally been left to the judiciary to resolve." *Woodby v Immigration & Naturalization Serv*, 385 US 276, 284; 87 S Ct 483; 17 L Ed 2d 362 (1966). The standard of proof utilized by a court "reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky v Kramer*, 455 US 745, 755; 102 S Ct 1388; 71 L Ed 2d 599 (1982). "The function of a standard of proof, as that concept is

embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " *Addington v Texas*, 441 US 418, 423; 99 S Ct 1804; 60 L Ed 2d 323 (1979) (citation omitted). "[W]hile private parties may be interested intensely in a civil dispute over money damages, application of a 'fair preponderance of the evidence' standard indicates both society's 'minimal concern with the outcome,' and a conclusion that the litigants should 'share the risk of error in roughly equal fashion.' " *Santosky*, 455 US at 755 (citation omitted).

I readily acknowledge that when a statute is silent regarding the applicable standard of proof, the default position is an evidentiary preponderance. However, the United States Supreme Court has "mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.' " *Id*. at 756, quoting *Addington*, 441 US at 424. The interests at stake here implicate the very essence of being a parent: the right to make decisions regarding a child's care, control, health, education and association, and the ability to maintain inviolate a family's integrity. "A paternity suit, by its very nature, threatens the stability of the child's world." *McDaniels v Carlson*, 108 Wn2d 299, 310; 738 P2d 254 (1987). Permanently stripping Jeffrey of his fatherhood of MP deprives both MP and Jeffrey of their mutual liberty interests in a continuing parent-child relationship. In my view, the parties' competing rights and interests qualify as "particularly important" and "more substantial than mere loss of money," necessitating application of a standard of proof more demanding than a mere preponderance. And I agree with the Washington Supreme Court in *McDaniels*: "Where these rights come into conflict, the rights of the child should prevail." *Id*. at 311.

I acknowledge that in cases involving the termination of parental rights, the preponderance of the evidence standard applies to a court's best-interest determination. *In Re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013). In so holding, this Court stressed that the clear and convincing standard applies to the first stage of termination proceedings, in which a court determines whether the moving party has demonstrated a statutory ground supporting termination of a parent's constitutional rights to the care and custody of a child. *Id*. at 86. Applying the due process analysis set forth in *Mathews v Eldridge*, 424 US 319; 96 S Ct 893; 47 L Ed 2d 18 (1976), the *Moss* Court explained that during the termination stage, "the use of error-reducing procedures[] such as the heightened standard of proof of clear and convincing evidence" favors the constitutional interests at stake. *Moss*, 301 Mich App at 87. Once a finding of statutory grounds for termination has been made, however, "the interests of the child and the parent no longer coincide, and the need for a heightened standard of proof is not present in the best-interest stage." *Id.* at 88.

The procedure set forth in the RPA meaningfully differs from that of a termination case. Under the RPA, a trial court must consider a child's best interests when considering whether to declare a child born out of wedlock. MCL 722.1443(4). This initial stage of RPA proceedings corresponds to the termination stage in an action brought under MCL 712A.19b. As in an action seeking the termination of parental rights, a presumed father under the RPA maintains a liberty interest in the custody of a child—and the child in the custody of her parent—until clear and convincing grounds justify severing that relationship. And the RPA clearly contemplates that a

-5-

judge may find that despite clear and convincing DNA evidence of paternity, a child's best interests would be jeopardized by the interruption of her stable and intact family life.

Although the Child Custody Act (CCA), MCL 722.21 *et seq.*, applies in a different setting, it guides my reasoning regarding the appropriate standard of "best interests" proof in a revocation of paternity case.[3] MCL 722.25(1) directs that "If the child custody dispute is between the parent or parents and an agency or a third person, the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is shown by clear and convincing evidence." The Supreme Court elaborated in *Hunter v Hunter*, 484 Mich 247, 265; 771 NW2d 694 (2009): "A third party seeking custody must meet a higher threshold. He or she must establish by clear and convincing evidence that it is not in the child's best interests under the factors specified in MCL 722.23 for the parent to have custody." Similarly, a court may not "issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c). Our state's jurisprudence has "consistently recognized" that the presumption of legitimacy arising from a child's birth to a married mother may be overcome only by a showing predicated on clear and convincing evidence. *In re KH*, 469 Mich 621, 634-635; 677 NW2d 800 (2004). As MP's legal father, Jeffrey was entitled to a presumption that MP's best interests would be served by his continuation in that role. See MCL 722.25(1).

In enacting the RPA, the Legislature left the statutory presumptions intact. Despite that the RPA expands the right of putative fathers to challenge the paternity of a child born within a marriage, the law rebuttably presumes that a child's best interests are served by maintaining that relationship, regardless of biological "truth." Our Supreme Court has never hesitated to assign a clear and convincing standard of proof to the evidentiary task of rebutting a statutory presumption. See *Reed v Breton*, 475 Mich 531, 541; 718 NW2d 770 (2006).

At the outset of these proceedings, Demski was not MP's parent. Thus, until the trial court entered its order of filiation, Demski remained a "third person." See MCL 722.22(j). Even armed with the DNA results confirming his biological connection, Demski had no inherent right to a declaration of his paternity. MCL 722.1443 subsections (4) and (5) underscore that DNA is not determinative in an action brought under the RPA. By commanding consideration of a child's best interests as part and parcel of the RPA inquiry, the Legislature placed the child's interests on a footing at least equal to that of DNA. Moreover, the statute's structure establishes that the best-interest determination must *precede* entry of an order declaring that a child was

---

[3] Our Supreme Court similarly drew upon other statutes when it determined the standard of proof for actions brought under the Whistleblowers Protection Act, MCL 15.361 *et seq.*: "Because whistleblower claims are analogous to other antiretaliation employment claims brought under employment discrimination statutes prohibiting various discriminatory animuses, they 'should receive treatment under the standards of proof of those analogous [claims].' " *Debano-Griffin v Lake Co*, 493 Mich 167, 175-176; 828 NW2d 634 (2013) (citation omitted, alteration in original).

-6-

born out of wedlock. The parental rights and concomitant rights of an alleged father (such as Demski) emerge only after a court has conducted a best-interest inquiry.

The RPA's ordering of priorities compels dual conclusions: (1) during the RPA proceedings, Demski's interest in establishing his paternity was subordinate to MP's best interests, and (2) as MP's legal father, Jeffrey enjoyed a presumption that MP's best interests would be served by maintaining the status quo. In structuring the RPA in this fashion, the Legislature implicitly declared that a child's best interests may outweigh a genetic link between a child and a stranger. And although the Legislature did not specify the standard of proof applicable to best-interest determinations under the RPA, it did not enact the statute in a vacuum. The principles that only clear and convincing evidence of a child's best interests justify disrupting an established environment or depriving a legal father of his paternal rights are firmly fixed in family law. I cannot conclude that the Legislature intended to abandon the heightened standard of proof in a directly analogous custodial context simply because it failed to reiterate it in the RPA.

Orders entered under the RPA have grave and far-reaching consequences. Disestablishing Jeffrey's paternity renders him a legal stranger to MP, despite that Jeffrey and Cassidie will continue to raise her as parental partners and will appear to the world (such as MP's school and friends) as her parents. As Judge Kirsten Frank Kelly pointed out in *Helton v Beaman*, 304 Mich App 97, 126; 850 NW2d 515 (2014) (KF KELLY, J., concurring), if Cassidie were to die, Jeffrey "would . . . have to seek custody as a third party and there is no guarantee that he would succeed or even have standing." Regardless of subsequent custody or parenting time decisions, inserting a new father into a child's life is inherently destabilizing. MP looked to Jeffrey for fulfillment of her needs. She understood that he, and only he, was her dad. Disconnecting and thereby forever altering that relationship risks incalculable damage to a child's development. In my view, the Legislature recognized as much by explicitly permitting a court to disregard biology and to enforce the presumption favoring stability and marriage.

Thus, I distill from the RPA's framework and its statutory background that the reciprocal rights of a married father and his child may not be disrupted absent clear and convincing proof that such infringement serves a child's best interests. Adoption of this higher standard of proof ensures that the evidence supporting a revocation of paternity decision meets "the degree of confidence our society thinks [a factfinder] should have in the correctness of factual conclusions" for this type of adjudication. *Santosky*, 455 US at 755.

Furthermore, the evidence presented during the RPA hearing did not clearly and convincingly demonstrate that MP's best interests would be served by severing Jeffrey's paternal rights and inserting Demski in that role. Even under a preponderance standard, the trial court's best-interest findings contravened the great weight of the evidence.

The court recognized that under factor (d), Jeffrey and his daughter "have a strong father/daughter bond of reciprocal love evidenced by tender and affectionate interaction," and that Demski had no established relationship with the child. This factor militated against revoking Jeffrey's paternity. Factor (e) requires consideration of "the age of the child." The trial court observed, "There is no contest to the date of birth, and almost two and a half year old age for [MP]." This "finding" omits mention of the testimony of psychologist Robin Zollar

-7-

regarding the cognitive abilities and emotional capacities of two-year-old children. In my view, Zollar's unchallenged testimony supports that affiliating Demski would not serve MP's best interests.

Zollar explained that at MP's age, "children are still very dependent physically and emotionally on a parental caretaker[.]" Further, Zollar stressed, "it is also an age that is influenced by the ability to communicate and the ability to receive information." Although MP could speak using three-word sentences, "her receptive language skills and her expressive language skills are at a point where she can't always express herself or always understand," as is "normal" at her age. Zollar explained that at two-and-a-half years of age, a child's receptive language skills do not encompass the idea of a new parent, and the child lacks "the ability to resolve conflicts or feelings." Accordingly, a two-and-a-half-year old is "less likely" to understand the role of a new parent. "[T]hey can't talk about it," Zollar explained, because they have not yet developed the required language skills. A child's inability to articulate confusion and distress may precipitate very real trauma. Zollar highlighted that "change in the parental family structure" may produce "mental anxiety. It can cause some acting out behaviors, such as problems with sleep, different things for different children. Frustration and anger." Zollar continued:

> Two and a half can be a pretty frustrating anger age anyway, because they're starting to, what we call "individuate," they're beginning to separate and see themselves as a little being, as opposed to just a part of the parents. . . . And so there's a lot going on at . . . that particular developmental age, with not the ability to be able to utilize language to resolve it or to understand it . . . .

In my view, the great weight of the evidence supported Zollar's testimony that because of her age, MP's best interests would not be served by opening the door to a situation she lacked the ability to understand or discuss. Furthermore, the trial court's failure to consider the age-specific evidence addressing MP's best interests constitutes legal error.

Zollar also provided the most useful evidence regarding factor (f), "[t]he harm that may result to the child." On direct examination, Zollar admitted that she had not met Demski, and could not offer opinions regarding him in particular. Generally, she offered, introducing a new person "as an individual" would be "less confusing" than introducing the new person as a parent. Zollar's testimony continued as follows:

> They have a mom and they have a dad, and I think it can be very difficult for kids when somebody says, "Oh, I'm your other dad" or "I'm your real dad" or "I'm your dad too." I think that's very confusing, particularly when you're fairly young. I think it's pretty hard to put that into any perspective. I think that different issues happen when you're older and that happens, but I think it's pretty basic when you're two and [a] half years old that that's going to be pretty confusing.

\* \* \*

-8-

*Q.* So let's get back to the factor. Do you have an opinion in this case, again based on observation, experience and all that, whether introducing a new father figure, be that Mr. Demski or anyone else, would cause harm to [MP]?

*A.* It could.

*Q.* . . . And . . . what type of harm could result?

*A.* . . . I think given her age, I think, and her reticence around new people, I think that could cause her to feel pretty insecure and fairly threatened and pretty confused. And the confusion may cause the feeling threatened, but I think it's still going to leave her feeling pretty vulnerable.

Zollar elaborated that adding a new "parental figure when a parental figure already exists . . . can sometimes create some alienation between the child" and the original parenting figure. The concomitant confusion "can lead to some anger" or "pulling back" from the original father. Additionally, Zollar emphasized, introducing a new parent can cause "some real anxiety, particularly dependent on how that introduction is made, how that relationship is expected or requested to proceed." She concluded: "And sadly, there are many times that the child isn't taken into consideration, the parents are."

On cross-examination, Zollar reiterated that introducing a new parent could harm a child, while admitting that it could also benefit the child. She clarified that if the new parent supports the child emotionally "[f]or a sustained period of time," the child could benefit. As Zollar's testimony concluded, the Petlicks' attorney (Kurt Armstrong) returned to the issue of harm to MP:

*Q.* Is it more likely that harm would result to [MP] by introducing any new parent figure at this time in her life?

*Mr. Banyon*: Objection. I don't believe she can form an opinion on that.

*Mr. Armstrong*: Well, I think she can.

*The Court*: Now, I - - the Court thinks she can, based on the foundation that's there and then her expert - - we'll overrule the objection.

Now, if you can't, we've got a problem. Can you answer the question?

[*Zollar*]: I'll try. I think it depends on the things that I talked about earlier: the commitment, the way it is done, and the sustainability and the willingness of all the parties to work towards this happening in a healthy way. I have some cases that I'm working with right now with preschool-age children where there are very similar issues. And those are not new issues, I've had those issues for years that I've had to work with. But so much is dependent on that commitment. The motive of the adults involved, the commitment, the ability to listen and learn when suggestions are given by someone whose primary interest is the child.

Grownups can take care of themselves, little kids can't. And so they need somebody that can act as an advocate for that relationship going in a healthy direction. And I think if that is available, I think it can be a very good thing for a child. I think if somebody says, "Oh, well, yeah, we'll just her [sic] for an hour or so and she'll be with . . . Uncle Bob and Aunt Suzie and dad and she'll be fine," I think that is not taking into account the child's needs. I think that is only focusing on the adult needs and I think that is wrong; because she has no way to say, "No, I'm not going to do it." She has no way to ask questions at this point. She has no way to understand.

So it's nothing personal about any individual. It's what's going to be best for this child. And I - - I strongly believe that, because I've seen really awful things happen when that doesn't happen.

Based on this testimony, the trial court found:

The testimony found to be most reliable relative to determining harm is that of the expert witness. . . .

Robin Zollar conducted three sessions, meeting one each with the defendants individually and a joint session including the minor, providing opportunity to observe the minor's interactions with defendants. She confirmed that the minor is initially reticent around new people. Her responses however to the questioning related directed to the harm factor address less the issue of introduction of plaintiff's interaction with the minor, but rather the question of how that would occur and expectations upon the minor. These are factors she was not afforded the opportunity to ask the plaintiff but would have desired to do so.

Her essential concerns articulated are first the limited verbal skills of the minor, and secondly, the willingness of adults to get along; their commitment. She did finally opine that [MP] could benefit from sustained commitment from the alleged father.

That MP "could benefit from sustained commitment from the alleged father" hardly qualifies as clear and convincing evidence that MP *would* benefit from a change in her paternity, or that she would not be harmed by the profound disruption of her life occasioned by the introduction of a new parent. In my estimation, the trial court's resolution of the harm inquiry rested on speculation, not proof. Stated alternatively, the evidence was in equipoise. Substituting Demski as MP's new father could hurt MP, or it might benefit her.

It bears emphasis that Demski bore the burden of proving that it was in MP's best interests to revoke Jeffrey's paternity and to substitute Demski as her new father. Demski brought forward no evidence regarding MP or her interests. And Demski offered no evidence that the very real harms Zollar described could be avoided or mitigated. Indeed, Demski never even acknowledged awareness of any emotional dangers *for MP* attendant to his parenthood quest.

-10-

The majority correctly observes that "Zollar's expert testimony supported both a conclusion that MP could be harmed by [Demski's] introduction into her life and also that his introduction could benefit her." In other words, the majority, too, views the evidence on this score as equally balanced. I believe the majority overlooks the obvious: Demski failed to carry his burden of proof on this factor.

Factor (g) requires a court to consider "[o]ther factors that may affect the equities arising from the disruption of the father-child relationship." The court acknowledged that this factor required it to consider "identifiable emotional, physical, and financial" equities. The court's discussion of this factor was limited to the following paragraph:

> Consistent with the testimony of the defendants, they are committed to each other, and each to [MP], whether Jeffrey Petlick is the identified legal father because of his bond of love for her and he will continue to support emotionally, financially, and provide the protections she requires. Equitably for the minor by law, the plaintiff would be required to provide for [MP]'s financial support.

While Jeffrey's multi-faceted commitment to MP is both admirable and relevant, the court avoided discussion of the evidence actually submitted on this score. Zollar expressed that if a new parent "is willing to make a very serious ongoing workable commitment where they are willing to work with the other caretakers, all the other caretakers, without being adversarial, then it can be a very good thing for children." Unrebutted evidence established that Demski's desire to parent MP had been inconsistent, at best. Text messages sent by Demski demonstrate that on more than one occasion, he expressed interest in "signing over" his parental rights to avoid paying child support. One message states: "[I] was told to plan on selling my house to afford this." Demski answered affirmatively when asked on cross-examination:

> You acknowledge that . . . your actions went from starting out, 'I'm involved, I went to the doctor's office,' to 'I don't want to be involved' in November. 'I want to have my rights terminated' or 'I don't want to have any rights, I don't want to pay any child support', correct?

The record simply does not substantiate a clear or convincing likelihood, or an evidentiary preponderance, that Demski would commit himself and his resources over the long term. His track record of commitment to MP is hardly consistent or reassuring.

While the trial court's exercise of its discretion in considering the RPA's best-interest factors should be afforded deference, I believe that the evidence clearly preponderates against the trial court's factual findings under factors (e), (f), and (g). Because the great weight of the evidence supported that MP's best interests would not be served by disestablishing Jeffrey's paternity and inserting Demski as her new father, I would reverse the trial court's orders finding MP a child born out of wedlock and affiliating Demski.

## II. THE CUSTODY AND PARENTING TIME ORDER

The trial court issued its bench ruling under the RPA on July 26, 2013. In that ruling, the court ordered that Demski meet with Zollar for a "continuing concluding evaluation as it would relate to the welfare of [MP]." The court continued: "And before any further orders from the

Court will issue regarding contact of any form, Ms. Zollar needs to complete that and report to the Court. I think that is related to both custody and parenting time."

On August 29, 2013, the trial court entered an order memorializing its bench ruling. That order stated in relevant part: "Child custody and parenting time issues are reserved until further Order from this Court[.]" On February 4, 2014, without holding an evidentiary hearing or any record proceedings substantively addressing MP's custody, the trial court entered an order awarding Cassidie and Demski joint legal custody of MP, with Cassidie retaining physical custody. The order stated that Demski would have parenting time "under the supervision of the Friend of the Court with a goal of achieving reasonable rights of parenting time." Two weeks later, the Petlicks moved for reconsideration of the custody and parenting time order, arguing that the trial court should not have entered it without holding a hearing under the CCA. The trial court responded on May 28, 2014, by denying the motion, and entering a seven-page written order reviewing the court's findings under the best-interest factors of the RPA. For the first time, the court detailed its findings regarding MP's established custodial environment and the best-interest factors stated in the CCA.

The majority holds that the Petlicks failed to preserve their objection to the procedure utilized by the trial court, specifically, the trial court's failure to hold a custody hearing. The majority has either misapprehended the chronology of events or has disregarded basic preservation principles.

No record evidence supports that the Petlicks could or should have anticipated that the trial court would issue a custody and parenting time order without holding a separate evidentiary hearing. Accordingly, the Petlicks could not have raised an objection to the trial court's procedure until the trial court sua sponte entered its February 4, 2014 order.

The Petlicks objected to the trial court's custody order in a timely fashion, 14 days after that order entered. They had no basis for objecting earlier, as they had no awareness that the trial court planned to enter a final custody order without holding a hearing as required under the CCA. They challenged the trial court's custody and parenting time order with a motion for reconsideration because reconsideration was the only vehicle available to them. I know of no precedent requiring litigants to read tea leaves or judicial hints to foresee a ruling not yet made. In my view, the issue raised in the Petlicks' motion for reconsideration is fully preserved. See *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). As such, it should be reviewed de novo. See *Schlender v Schlender*, 235 Mich App 230, 232; 596 NW2d 643 (1999) ("This Court reviews a claim of legal error [there the failure to conduct an evidentiary hearing] de novo.").

The trial court committed two serious errors warranting reversal of its custody and parenting time order. First, it rendered its order in the absence of an evidentiary hearing during which the parties could introduce evidence relevant to the factors set forth in the CCA and cross-examine witnesses. Second, in crafting its ruling, the trial court considered ex parte evidence which it deliberately withheld from the parties. Both errors should fundamentally undermine a reviewing court's confidence in the trial court's custody and parenting-time rulings.

The CCA "is intended to erect a barrier against removal of a child from an established custodial environment and to minimize unwarranted and disruptive changes of custody orders." *Heid v AAASulewski (After Remand),* 209 Mich App 587, 593-594; 532 NW2d 205 (1995). Here, the trial court correctly recognized that MP's established custodial environment resided with Cassidie.

A court may not issue a new order changing a child's established custodial environment absent "clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c).[4] The court rules contemplate that a court will conduct an evidentiary hearing in contested custody cases. MCR 3.210(C)(1) provides that "[w]hen the custody of a minor is contested, a hearing on the matter must be held within 56 days (a) after the court orders, or (b)

---

[4] I use the term "custody" in this dissenting opinion to also encompass parenting time. A child's best interests govern parenting time determinations. *Berger v Berger,* 277 Mich App 700, 716; 747 NW2d 336 (2008). "Both the statutory best interest factors in the Child Custody Act, MCL 722.23, and the factors listed in the parenting time statute, MCL 722.27a(6), are relevant to parenting time decisions." *Shade v Wright,* 291 Mich App 17, 31; 805 NW2d 1 (2010). Parenting time determinations are governed by their own list of best interest factors:

(a) The existence of any special circumstances or needs of the child.

(b) Whether the child is a nursing child less than 6 months of age, or less than 1 year of age if the child receives substantial nutrition through nursing.

(c) The reasonable likelihood of abuse or neglect of the child during parenting time.

(d) The reasonable likelihood of abuse of a parent resulting from the exercise of parenting time.

(e) The inconvenience to, and burdensome impact or effect on, the child of traveling for purposes of parenting time.

(f) Whether a parent can reasonably be expected to exercise parenting time in accordance with the court order.

(g) Whether a parent has frequently failed to exercise reasonable parenting time.

(h) The threatened or actual detention of the child with the intent to retain or conceal the child from the other parent or from a third person who has legal custody. A custodial parent's temporary residence with the child in a domestic violence shelter shall not be construed as evidence of the custodial parent's intent to retain or conceal the child from the other parent.

(i) Any other relevant factors. [MCL 722.27a.]

after the filing of notice that a custody hearing is requested[.]" Ample case law supports that a court cannot order a custodial change without first holding a hearing. See *Mann v Mann*, 190 Mich App 526, 531-532; 476 NW2d 439 (1991) ("Permitting a court to even temporarily change custody solely on the basis of a Friend of the Court referee's recommendation and without holding a hearing would circumvent and frustrate one of the purposes of the Child Custody Act—to minimize the prospect of unwarranted and disruptive changes of custody."), and *Pluta v Pluta*, 165 Mich App 55, 60; 418 NW2d 400 (1987) ("We do not believe that the trial court should be allowed to circumvent and frustrate the purpose of the law by issuing an ex parte order changing custody without any notice to the custodial parent or a hearing on the issue whether clear and convincing evidence was presented that a change of custody was in the child's best interest.").

The majority dispenses with the need for a hearing by holding that the bench trial under the RPA sufficed. The majority observes, "The trial featured seven witnesses providing several hundred pages worth of testimony and dozens of exhibits presented by the parties." While that may be true, the trial did *not* "feature" a full exposition of evidence relevant to MP's best interests under the CCA because the trial court refused to consider it. Equally important, the trial court denied the parties an opportunity to cross-examine Zollar regarding the custody and parenting-time recommendations which ultimately guided the trial court's decisions.

During Zollar's testimony at the RPA trial, the Petlicks' counsel attempted to elicit her opinion regarding parenting time in the event the court ordered it. Demski's counsel objected, arguing that that Zollar's opinion was not relevant "to these proceedings":

> *Q*. The - - the - - the Court may ultimately determine that - - that Mr. Demski does have some parenting time; could happen. If - - if - - if that occurs, would - - would you be willing to - - to act and to assist in any bridging - -
>
> *Mr. Banyon*: I'm - - I'm going to object to this question, Your Honor. It's certainly not relevant to these proceedings.
>
> *Mr. Armstrong*: I'll withdraw it. I'm just trying to help, Judge. I'll withdraw the question. I'm done with the witness.
>
> *The Court*. All right, it's withdraw[n].

Shortly thereafter, the Petlicks' attorney tried to question Zollar regarding her experience in "custodial dispute[s]" not involving abuse or neglect. The trial court sustained Demski's relevance objection:

> *Q*. And how many children have you assessed under the age of two and a half not related to sexual abuse?
>
> *A*. Well, probably out of the several hundred, probably 150 or so, given the fact that I frequently get referrals regarding other - - other issues that involve kids - - or children under the age of two and a half.
>
> *Q*. And how many of that hundred or so have you - -

-14-

*Mr. Armstrong*:  Your Honor, I believe she said 150.

*Q*.  - - 150 or so have you assessed with respect to a custodial dispute not involving abuse or neglect?

*Mr. Armstrong*:  Your Honor, I'll object.  This isn't a custodial dispute.

*Mr. Branyon*:  It involves custody, - -

*Mr. Armstrong*:  Well, - -

*Mr. Banyon*:  - - parenting time.

*Mr. Armstrong*:   - - it may become one, but it's not at this point, Your Honor.

*The Court*:  I'm - - and your objection is?

*Mr. Armstrong*:  My objection is it's not relevant.  I attempted to go into that particular area and he cut me off, and so apparently he doesn't want to go into that area; and, therefore, it's not relevant today.  We could deal with that later apparently.  If - - if the Court - -

*The Court*:  All right.  I'm going to - - I'm going to sustain the objection as to where we are now. . . .

These excerpts illustrate that neither the parties nor the trial court intended that the RPA hearing would encompass a best-interest hearing under the CCA.  Zollar's views were not aired or subjected to scrutiny through cross-examination.  Not a word was spoken by the parties or the trial court regarding most of the best-interest factors under the CCA.[5]  Nor does the record

---

[5] The best interest factors set forth in MCL 722.23 are:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

-15-

substantiate that the parties agreed to forego a separate best-interest hearing in the interest of conducting an omnibus proceeding. In my view, the trial court clearly and substantially erred by relying on a limited record to decide the issues of custody and parenting time. See *Crampton v Crampton*, 178 Mich App 362, 363; 443 NW2d 419 (1989) ("It was not sufficient for the court to rely on the testimony and evidence from the referee's hearing and to limit the taking of further testimony as was done here.").

Moreover, a child-custody hearing demands the presentation of admissible evidence subject to cross-examination. The trial court requested and entertained "a report with recommendations relative to Custody and Parenting time," authored by Zollar. According to the trial court's written opinion denying the Petlicks' motion for reconsideration, the report was "received by the court [on] November 20, 2013." Zollar's report is not in the record and apparently was not provided to counsel. Yet according to the trial court's opinion on reconsideration, the substance of the report formed the basis for the trial court's parenting time order.[6]

MRE 706 allowed the trial court to appoint Zollar as an expert witness. However,

> (e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
>
> (f) The moral fitness of the parties involved.
>
> (g) The mental and physical health of the parties involved.
>
> (h) The home, school, and community record of the child.
>
> (i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.
>
> (j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents.
>
> (k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.
>
> (*l* ) Any other factor considered by the court to be relevant to a particular child custody dispute.

[6] That the trial court relied on Zollar's report is supported by many comments within its opinion on reconsideration: "The court reviewed the recommendation in light of all proofs preserved," "The Friend of the court was required to establish a bridging schedule for the exercise of the initial parenting time to be held in a 'therapeutic setting' under the direction of counselor Robin Zollar," "The court upon consideration of her report and recommendation then fashioned the order from which Defendants seek reconsideration," Demski's "parenting time shall consistent with Robin Zollar's recommendation be supervised by her in a therapeutic environment."

[a] witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness. [MRE 706(a).]

The court did not advise the parties that Zollar had made any findings until issuing its opinion on reconsideration and never informed the parties of their substance and content. Zollar was not subject to cross-examination before the trial court (apparently) incorporated Zollar's opinions into its custody and parenting-time decision. Ultimately, it is unknown whether the trial court actually adopted Zollar's recommendations as she expressed them. This possibility buttresses my belief that the trial court's procedure violated MRE 706.

The Code of Judicial Conduct does not preclude all ex parte communications with witnesses. However, it requires that a judge who elects to "obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge" provide "notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond." Code of Judicial Conduct, Canon 3(A)(4)(b). This exception to the general rule barring ex parte communications comes closest to addressing what occurred in this case. Here, the trial court consulted Zollar regarding expert opinion rather than "the law." And the trial court failed to afford advance notice of Zollar's participation in this stage of the proceedings, or the substance of her recommendations, to the parties. The report's absence from the record precludes this Court's review of the trial court's interpretation of Zollar's recommendations. I find the trial court's procedure in this highly contested custody case deeply troubling.

The majority, however, shrugs off any claim that the Petlicks suffered a violation of their rights, summarily stating that "[t]he Confrontation Clause does not apply to civil proceedings." I am not reassured. The right to confront and cross-examine witnesses "is implicit in our historical concepts of due process and of fair trial[.]" *Durant v Stahlin*, 375 Mich 628, 649; 135 NW2d 392 (1965). In *Hayes v Coleman*, 338 Mich 371, 380-381; 61 NW2d 634 (1953), our Supreme Court favorably quoted the following language from a Missouri case, *Gurley v St Louis Transit Co*, 259 SW 895 (Mo App, 1924):

The right of a litigant to cross-examine an adverse witness within proper bounds is an absolute right, and it is not within the discretion of the court to say whether or not the right will be accorded. The right of cross-examination is regarded of such consequence that it is made one of the chief grounds for the exclusion of hearsay evidence. If the right to cross-examine an adverse witness be denied or unduly limited or restrained, the testimony given by the witness would, in a very marked degree, partake of the character of hearsay testimony. It is always permissible upon the cross-examination of an adverse witness to draw from him any fact or circumstance that may tend to show his relations with, feelings toward, bias or prejudice for or against, either party, or that may disclose a motive to injure the one party or to befriend or favor the other. The party producing a witness may not shield him from such proper cross-examination for the reason that the facts thus elicited may not be competent upon the merits of the cause.

The majority concedes that it would have been "better practice to have received [Zollar's] report before the conclusion of proofs at trial, and to have included that report in the trial court record[.]"  Yes, it would.  But the majority's casual observation misses the point.  "Cross-examination is a critical element in the truth-determining process." *Brock v Roadway Express, Inc*, 481 US 252, 276; 107 S Ct 1740; 95 L Ed 2d 239 (1987).  It enhances the quality and the reliability of the decision-making process.  The Petlicks had no opportunity to challenge and to test Zollar's opinions in a manner that would potentially influence the trial court's decision-making process.  Whether Zollar once served as the Petlicks' expert witness is of no moment, given that she later provided crucial information to the trial court in a manner that can only be described as secret.  Her opinions and recommendations may have been incomplete or misleading or based on improper criteria.  The majority is satisfied with remaining in the dark.  In my view, MP's best interests demand an airing.

Zollar's opinions and recommendations are not matters of national security.  They guided the Friend of the Court's parenting time recommendations and the trial court's orders, and the majority has proposed no logical basis for excluding those opinions from effective and adversarial dissection.  I would hold that the trial court clearly erred by denying the Petlicks an opportunity to review Zollar's report and to cross-examine her before issuing its custody and parenting-time decisions.

In urging remand to the trial court, I concede that proceeding according to the well-established rules governing custody and parenting-time determinations risks once again destabilizing MP.  But in my view, the trial court's failure to hold an evidentiary hearing and its consideration of ex parte evidence contaminated its best-interest findings relevant to custody and parenting time.   I have no confidence that MP's best interests have been served by the court's order, because I have no means of understanding its evidentiary foundations.   Because the trial denied MP and Cassidie the most rudimentary form of due process, its decisions lack inherent integrity and must not stand affirmed.

/s/ Elizabeth L. Gleicher