*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* BABY BOY DOE, Minor.

---

PETER KRUITHOFF,

        Petitioner-Appellant,

v

CATHOLIC CHARITIES OF WEST MICHIGAN,

        Respondent-Appellee,

and

ADOPTIVE PARENT NUMBER 1 and
ADOPTIVE PARENT NUMBER 2,
        Appellees.

FOR PUBLICATION
November 10, 2022

No.   353796
Kalamazoo Circuit Court
Family Division
LC No.   2018-006540-NB

---

ON REMAND

Before:  RONAYNE KRAUSE, P.J., and CAVANAGH and BOONSTRA, JJ.

BOONSTRA, J. (*dissenting*).

        I dissent.  Today, our system of justice should be hanging its head in shame.  It has woefully failed in the most fundamental of ways.

        Petitioner—the presumed father of Baby Boy Doe—lost his parental rights to his newborn child essentially because he did not see a legal notice that ran for one day in a newspaper published in a city in which he did not live.  Petitioner was never adjudicated to be an unfit parent; he was never even given notice of the proceedings or an opportunity to correct any conditions that may have been a basis for an adjudication of his parental rights.  Nor was the termination of his parental rights determined to be in Baby Boy Doe's best interests.  Nonetheless, the majority simply tells petitioner that his "window of opportunity has long since closed."  From this record, it appears that

petitioner's only hope would have been to have daily examined *every* newspaper in Michigan and to have followed up on *every* notice of a surrendered newborn; either that or, as Justice WELCH has suggested, to have filed a "notice of intent to claim paternity" of Baby Boy Doe before Baby Boy Doe was born, despite the fact that Baby Boy Doe was born in wedlock and his paternity was therefore otherwise presumed under the law, see *In re KH*, 469 Mich 621, 630; 677 NW2d 800 (2004); see also MCR 3.903(7)(a), and despite the fact that petitioner did, in fact, seek custody of Baby Boy Doe even before he was born. Given the extraordinary nature of either of those alternatives, petitioner would properly be forgiven if he were to perceive and take exception to the "well, if only you had done more" sentiment expressed in the majority opinion issued in this case. But what of the responsibility of the child placing agency under the Safe Delivery of Newborns Law (SDNL), MCL 712.1 *et seq.*, or more importantly, what of the responsibility of the state to provide constitutionally sound safeguards before commandeering parental rights (or, to use the majority's hyperbolic lexicon, before ripping the child from his father's arms)—without process, due or otherwise?[1]

Little over eight years ago, our Supreme Court reaffirmed, at some length, the "vital interest in preventing the irretrievable destruction of their family life" that parents possess. See *In re*

---

[1] I acknowledge that, theoretically, petitioner could have filed a petition for custody of Baby Boy Doe under the SDNL—even without seeing the legal notice—in Ottawa circuit court (petitioner being located in Ottawa County). See MCL 712.10(1)(c). This would have obligated the trial court to locate and contact the court that, unbeknownst to petitioner, issued the order placing Baby Boy Doe with adoptive parents. MCL 712.10(2). However, I do not fault petitioner for failing to take this anticipatory action. First, petitioner did in fact take action to seek custody of Baby Boy Doe in Ottawa circuit court; he simply did so as part of his divorce action (which this Court held to be proper, only to be reversed in that respect by our Supreme Court). Indeed, petitioner successfully obtained an Ottawa circuit court order—which noted that it was suspected that Baby Boy Doe had been surrendered under the SDNL—granting petitioner temporary custody of Baby Boy Doe even before petitioner became aware of the separate proceeding in which his parental rights were terminated. Petitioner reasonably could have expected that the Ottawa circuit court was therefore obligated to "locate and contact the court [placing the newborn]." MCL 712.10(2). Second, the record shows that petitioner was searching for his soon-to-be ex-wife and child, but did not locate Baby Boy Doe's mother until long after the 28-day deadline provided in MCL 712.10(1) had passed. In other words, petitioner did not even know that (or when) Baby Boy Doe had been born or surrendered until long after the relevant time period had expired. According to our Supreme Court, a petition for custody under the SDNL would have been invalid if it was filed before Baby Boy Doe's birth. See *In re Doe*, ___ Mich ___; ___; 975 NW2d 486, 488-490 (2022). Petitioner therefore would have had to thread a narrow (and unknowable) needle to have filed a valid petition for custody under the SDNL under these circumstances, without notice of either the date or location of Baby Boy Doe's birth. I would not lay the blame on petitioner for the fact that, with the benefit of full information, hindsight, and time to reflect, we can think of something else petitioner could have done to preserve his parental rights. As I will elaborate on, those rights should have been better-protected by the legal system, particularly given the fundamental nature of the parental rights at stake, and that system's failures far outstrip any failures arising out of petitioner's inability to anticipate and prepare for every contingency.

*Sanders*, 495 Mich 394, 415; 852 NW2d 524 (2014), quoting *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). In *Sanders*, the Court repeatedly emphasized the "importance of the private interest at stake" when the state seeks to terminate a parent's rights to his child, noting that it is a "core liberty interest" that "cannot be overstated," a right "essential to the orderly pursuit of happiness by free men" and "so deeply rooted that the fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents." *Id*. at 409, 410, 415 (quotation marks and citations omitted). The Court also noted the presumption that fit parents act in the best interests of their children, and that, simply put, "all parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody." *Id*. at 412 (quotation marks and citation omitted). Yet in this case, petitioner (who had acted to obtain a court order—shortly *before* the child's mother surrendered him—enjoining any actions toward the adoption of Baby Boy Doe) received no such hearing, because, alas, he missed a small printed notice published in the faraway Grand Rapids Press on August 16, 2018, and did not act to file a new custody action under the SDNL—notwithstanding his earlier request for custody in his complaint for divorce.

The issue in *Sanders* was, essentially, whether one parent could act unilaterally in a way that allowed the state to interfere with, and potentially terminate, the other parent's parental rights without that parent ever having been judged unfit. Although raised in the context of a child protective proceeding under the juvenile code, see MCL 712A.1 *et seq*., the *Sanders* Court held that one parent's admissions during the adjudication phase could not bind the other, because it allowed the interference with and even termination of a parent's rights without a prior determination of unfitness. *Sanders*, 495 Mich at 420-422. The *Sanders* Court's conclusion was clear: "*due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship*." *Id*. at 422 (emphasis added). Yet, no such adjudication was made in this case because petitioner missed a legal notice in a distant newspaper. Instead, Baby Boy Doe's mother acted unilaterally to terminate not only her own parental rights, but to surreptitiously engineer the termination of petitioner's fundamental parental rights as well, aided by respondent's *de minimis* efforts at providing notice by publication.

In my judgment, the minimal efforts made to provide notice in this case were unreasonable under the SDNL; alternatively, the SDNL itself is unconstitutional as applied to a nonsurrendering parent. But this Court, and our Supreme Court, have danced around the constitutional questions in this case. See generally *In re Doe*, ___ Mich App ___; ___ NW2d ___ (2021) (Docket No, 353796) (*Doe I*), *In re Doe*, ___ Mich ___; ___; 975 NW2d 486, 488-490 (2022) (*Doe II*). In doing so, the legal system has refused to unravel the mess that it created, and in the process it has divested petitioner of his fundamental right to parent his own child—without so much as the most minimal due process.

We did not address the constitutional issues in *Doe I* because they were not raised on appeal at that time and, in any event, we had already determined that petitioner's parental rights had been improperly terminated. However, we noted that "petitioner has argued at various points in the proceedings that the efforts undertaken by respondent to identify and locate him, in order to provide him with notice of Baby Boy Doe's surrender, were not reasonable, and that his motion to unseal the records in this case was part of his effort to challenge the reasonableness of those efforts." *Doe I*, ___ Mich at ___, slip op at 10. Although we did not go so far as to hold that respondent had not satisfied the notice requirements of the SDNL, we did note our disagreement

with the Kalamazoo Circuit Court's apparent interpretation of MCL 712.7[2] as providing that publication of a notice, for one day, which merely generically states the newborn's date of delivery and hospital location, in a newspaper published in a county in which neither parent resides, constitutes "reasonable efforts to identify, locate, and provide notice of the surrender of the newborn to the nonsurrendering parent." MCL 712.7(f). *Id.*, quoting MCL 712.7(f). We also noted that, although petitioner's counsel had attempted—in the trial court—to raise the issue of the constitutionality of the SDNL, the trial court made clear that it would not address that argument, informing counsel that he was "barking up the wrong tree for an unconstitutional statute." Consequently, the trial court never ruled on the constitutionality of the statute in the first instance.

I continue to believe that our interpretation of MCL 712.7 was correct. Our Supreme Court in *Doe II* did not address that aspect of our reasoning. In a footnote to the majority opinion in *Doe II*, however, the Supreme Court noted that it had asked the parties to brief the issue "whether the application of the SDNL violates the due process rights of an undisclosed father." *Doe II*, ___ Mich at ___ n 6; 975 NW2d 486, 489 n 6 (citation omitted). However, the Court ultimately did not address the issue, stating:

> We generally do not reach issues that were not raised and briefed in the lower courts. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) ("Although this Court has inherent power to review an issue not raised in the trial court to prevent a miscarriage of justice, generally a 'failure to timely raise an issue waives review of that issue on appeal.'") (citations omitted); *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234 n 23; 507 NW2d 422 (1993) ("This Court has repeatedly declined to consider arguments not presented at a lower level, including those relating to constitutional claims. We have only deviated from that rule in the face of exceptional circumstances.") (citations omitted). This course of action is particularly suited to this issue because it raises a constitutional question of first impression not only for this state, but also for other states across the country. Justice ZAHRA considers it "debatable" whether this issue was preserved in the trial court. But aside from a single line by petitioner's counsel at a hearing, petitioner

---

[2] MCL 712.7 provides that a child placing agency shall:

> (f) Within 28 days, make reasonable efforts to identify, locate, and provide notice of the surrender of the newborn to the nonsurrendering parent. The child placing agency shall file a written report with the court that issued the order placing the child. The report shall state the efforts the child placing agency made in attempting to identify and locate the nonsurrendering parent and the results of those efforts. If the identity and address of the nonsurrendering parent are unknown, the child placing agency shall provide notice of the surrender of the newborn by publication in a newspaper of general circulation in the county where the newborn was surrendered.

Although the trial court arguably made a determination in this regard as an implicit part of its original ruling, the issue would have been most amenable to appellate review if the trial court had made its findings explicit.

never raised or addressed the constitutionality of the statute throughout this litigation, at least not until prompted by this Court. The constitutional issue, therefore, has not been properly preserved or even presented to the Court. [*Id*.]

Chief Justice MCCORMACK, while agreeing with the result reached by the majority, also expressed via a separate opinion her concerns regarding the constitutionality of the notice requirements of the SDNL. See *Doe II*, ___ Mich at ___; 975 NW2d at 490 (MCCORMACK, C.J., concurring in part and dissenting in part) ("I write separately to express my deep reservations about whether the statute's notice-by-publication provision sufficiently protects the due-process rights of nonsurrendering parents."). And Justice ZAHRA, in a separate opinion joined by Chief Justice MCCORMACK, noted that the SDNL provides "a dubious method of providing notice before terminating a legal parent's parental rights" and that "the SDNL is a highly flawed law because of significant constitutional concerns that this Court should not sweep under the rug," and concluded that "the SDNL is unconstitutional as applied to legal parents." *Doe II*, ___ Mich at ___; 975 NW2d at 492-493 (ZAHRA, J., concurring in part and dissenting in part).

Over and over again, the courts, while recognizing the serious constitutional issues in this case, have declined to squarely address them; the appellate courts have hidden behind the issue-preservation doctrine, noting that the *prior* court had not had an opportunity to address these issues, and therefore it would be improper for us to do so. Issue preservation requirements are important; litigants have a duty to give the trial court an opportunity to correct its alleged error. *Smith v Musgrove*, 372 Mich 329, 339; 125 NW2d 869 (1964). But these requirements are not fundamental constitutional principles, nor are they rigidly inflexible. Courts have stated, for example, that a party should not be penalized by a lower court's failure to address or decide an issue that was properly before it. See *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994); see also *Loutts v Loutts*, 298 Mich App 21, 23-24; 826 NW2d 152 (2012). More generally, courts have recognized that issue preservation requirements may give way to avoiding the entry of an unconscionable decree, *Kratze v Indep Order of Oddfellows, Garden City Lodge No. 11*, 442 Mich 136, 142; 500 NW2d 115 (1993), or to prevent manifest injustice. *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006); see also *Duffy v Dep't of Natural Resources*, 490 Mich 198, 209 n 3; 805 NW2d 399 (2011). And in this case, petitioner did attempt to raise the issue in the trial court, but was promptly shut down.

The time has come to address the constitutional issues that the trial court previously declined to address (and that this Court and our Supreme Court have consequently ducked). Petitioner's arguments concerning the adoption file and the Kalamazoo Circuit Court's rulings depended upon whether his parental rights were properly terminated under the law. And that question in turn hinges on the constitutionality of the SDNL as applied to him. I would either determine the constitutional issue now in this Court or, particularly in light of our Supreme Court's stated concern with addressing issues that were not argued and decided in the trial court (and despite the lengthening of the overall proceedings), remand the matter to the trial court with instructions to consider two questions, after allowing the parties an opportunity to brief and argue them. First, whether respondent's efforts to provide notice to petitioner indeed satisfied the requirements of MCL 712.7(f). Second, if so, whether petitioner's right to the due process of law under the Michigan and United States Constitutions was violated by the application of the SDNL to him as a nonsurrendering legal parent. To do other than to allow a full, on-the-merits resolution

-5-

of these issues serves only to uphold—indeed, to cement into law—the constitutional violation that I believe has occurred.

I note also that the majority contends that there would be no real point in reinstating petitioner's parental rights and permitting him to petition for custody, because it posits that there is no way that the best interests of Baby Boy Doe would be served by returning him to the custody of his father. The majority makes no mention of the general presumption that a fit parent acts in the best interests of his child, or of our Supreme Court's clear statement that the state *must* adjudicate a parent's unfitness *before* terminating his parental rights. *Sanders*, 495 Mich at 420-422. There is a reason that the best-interest phase of a child protective proceeding follows the adjudicative phase and a finding that statutory grounds for termination have been proven; a court is not permitted to skip to the end and wave away the procedural protections of a fundamental right because the outcome appears to have become a *fait accompli*. The *Sanders* court rejected a similar argument from the Department of Health and Human Services. See *id*. at 420 ("The possibility of a fix at the back end is not sufficient to justify a lack of process on the front end. Rather, the state must adjudicate a parent's fitness *before* interfering with his or her parental rights."). More generally, courts are not in the habit of declining to hold a trial because it appears obvious that a defendant is guilty, or skipping the adjudication and dispositional phases because a parent appears so clearly unfit that we need not waste the time and energy. When dealing with fundamental rights and due process concerns, it is more than a bit cavalier for a reviewing court to toss off a blithe "well, you'd never be able to win at the hearing anyway." And it must be especially galling for a litigant to hear this from a legal system that created the complex tangle of laws, deadlines, and precedents that resulted in him losing his child because he missed a needle-in-a-haystack notice in an isolated newspaper to which he had no reason to subscribe. By contrast, the legal system has often bent over backwards to allow parents the chance to retain their parental rights, even in the face of significant evidence of parental unfitness, in child protective proceedings following a petition to terminate parental rights under MCL 712A. See, e.g., *In re HRC*, 286 Mich App 444, 449; 781 NW2d 105 (2009) (vacating the trial court's best-interest determination and remanding for further proceedings regarding whether termination of the respondents' parental rights was warranted, despite affirming the trial court's finding that the children had been sexually abused); *In re Frey*, 297 Mich App 242, 245-248; 842 NW2d 569 (2012) (noting that the respondents had been provided numerous services for 22 months prior to termination, and that the inciting incident that led to these proceedings involved an automobile accident with the minor child in the car; the respondent-father had been driving over 100 miles per hour while possessing a blood alcohol level of 0.24 grams per 100 milliliters, the respondent-mother had taken narcotics immediately before the accident and was aware that the respondent-father was inebriated before entering the car with the child, and the accident had resulted in the respondent-father's fifth drunk driving conviction in the past two years). In fact, it is an essential feature of child protective proceedings that, absent certain extreme aggravating factors, the state is obligated to make reasonable efforts to reunify a child with his parents before even seeking termination of those rights; these efforts include the creation of a comprehensive service plan that outlines steps that the state, as well as the parents, will take to "rectify the issues that led to court involvement and achieve reunification." *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017). See also MCL 712A.18f(3)(b) and (c); MCL 17A.19a(2). Yet in this case, despite the fact that petitioner's fitness as a parent was never even challenged, the termination of his parental rights proceeded with merciless swiftness and with a marked lack of concern for his right to parent his own child. Simply shrugging our shoulders and saying "well that's a different statute" is, in my view, entirely inadequate. Fundamental rights

-6-

are fundamental; they cannot be stripped away merely by the passage of a statute that effectively deems them not to be so fundamental after all.

Further, the majority is, in my view, incorrect about the actions the trial court could take if, in the course of adjudicating a custody petition under the SDNL, it were to determine that it would be in Baby Boy Doe's best interests to remain with his adoptive parents. To the extent that MCL 712.14 allows termination of parental rights without a prior adjudication of parental unfitness, it is clearly constitutionally infirm. See *Sanders*, 495 Mich at 422. However, in my view, MCL 712.15 states quite clearly what the trial court may do following a best-interest hearing under the SDNL:

> Based on the court's finding under [MCL 712.14], the court may issue an order that does 1 of the following:
>
> (a) Grants legal or physical custody, or both, of the newborn to the parent and either retains or relinquishes jurisdiction.
>
> (b) Determines that the best interests of the newborn are not served by granting custody to the petitioner parent and orders the child placing agency to petition the court for jurisdiction under [MCL 712A.2].
>
> (c) Dismisses the petition.

MCL 712.15(b) thus explicitly pairs a determination that the best interests of the child are not served by granting custody to a petitioning parent with an order that the child placing agency *begin a child protective proceeding via petition*. In other words, the child placing agency would file a petition alleging parental unfitness, and the case would proceed through the usual adjudicative, dispositional, and if necessary, best-interest phases.[3] Reading the statute as the majority impliedly does merely loops us back to the same constitutional problem we've had all along: the termination of parental rights without a prior determination of unfitness.

The majority also makes much of the fact that Baby Boy Doe has been with his adoptive family for his entire life, and indeed has never met his father. That, of course, is the very injury that petitioner alleges was done to his family by the child placing agency and a complicit court system; yet, it is now deployed against him as a reason why he must simply walk away from his child as it is ripped from his outstretched arms. It seems unlikely to me that, had petitioner taken Baby Boy Doe from the hospital while his mother slept after giving birth, driven to another city and surrendered him, and the case otherwise unfolded the same as it has in this case, that the majority would so easily reach the same conclusion. In any event, by describing a parent's efforts to reunite himself with his child as the equivalent of treating the child "as a piece of chattel subject to a claim for replevin," the majority engages in a level of hyperbole that is nothing short of callous

---

[3] While MCL 712.15(c) does allow for the dismissal of a petition, dismissal is not prescribed as the action that follows an unfavorable best-interest determination. That circumstance is instead addressed by MCL 712.15(b); it is reasonable to conclude that MCL 712.15(c) refers to the trial court's power to dismiss the petition for other defects.

and cruel. Over and over again in our society, in our movies, novels, and books, we are told, consistent with accepted societal norms, that a good parent would move heaven and earth to reunite himself with his child, that he would never give up, and that he would brave impossible odds and fight any battle to have his child back in his arms. Yet here the majority deigns to treat petitioner's efforts as somehow vaguely distasteful, suggesting that he should *really* consider how, given the passage of time, Baby Boy Doe is probably pretty settled with his new family and that maybe petitioner is just being selfish. I could not endorse that sentiment or that language even if I agreed with the majority's legal analysis. Again, while the best interests of the child are indeed paramount in child protective proceedings, we presume, absent evidence to the contrary, that a fit parent acts in those interests. *Id*. at 420-422.

Given the refusal of our Supreme Court and this newly-comprised panel of this Court[4] to address the serious constitutional issues presented, I am left to wonder what Baby Boy Doe will make of all of this as an adult—assuming that these proceedings are not forever kept from him. Will he have grown up thinking that both of his parents chose to abandon him and give him up for adoption, only to learn that his father in fact tried for *years* to be his parent, only to ultimately fail because he didn't see legal notice in a newspaper? What will he think of the adoptive parents that persisted in their adoption despite knowing that his father did not want to give him up, or of the child placement agency that refused to make any effort to identify and locate his father other than running a small notice in a distant newspaper on a single day? What will he think of the legal system that allowed a procedural tangle and issue preservation requirements to defeat his father's attempts to find him and unite together as a family? I fear that he might not think much of any of us. The legal system has failed several people in this case, including the adoptive parents, petitioner, and Baby Boy Doe himself. All I can hope for is that, going forward, we can make the changes necessary to prevent this from ever happening again, and that possibly, at some later time, Baby Boy Doe's adoptive parents and his birth father might come to a solution outside the court system that provides everyone a measure of peace. I must admit that my hope for the latter is slim at best, but a solution apparently cannot be found from within the court system that has so utterly and miserably failed everyone.

For these reasons, I dissent.

/s/ Mark T. Boonstra

---

[4] Judge BECKERING, who joined the majority opinion of this Court in *Doe I*, now serves on the United States District Court for the Western District of Michigan.